**M. O. SIMS et al., Plaintiffs,**

**R. E. Farr et al., Intervening Plaintiffs,**

**United States of America, Plaintiff and Amicus Curiae,**

v.

**Mabel AMOS, Secretary of State of the State of Alabama, et al., Defendants,**

**Pierre Pelham et al., Intervening Defendants.**

**E. D. NIXON et al., Plaintiffs,**

**Alabama Independent Democratic Party, a corporation, Plaintiff-Intervenor,**

v.

**George C. WALLACE, as Governor of the State of Alabama, et al., Defendants,**

**Pierre Pelham et al., Intervening Defendants.**

**J. Elbert PETERS, individually, for himself, and for all others similarly situated, Plaintiff,**

v.

**George C. WALLACE, as Governor of the State of Alabama, et al., Defendants,**

**Pierre Pelham et al., Intervening Defendants.**

Civ. A. Nos. 1744–N, 3017–N and 3459–N.

United States District Court, M. D. Alabama, N. D.

Jan. 3, 1972.

Morris Dees, Jr. and Joseph J. Levin, Jr., Montgomery, Ala., Charles Morgan, Jr., Morris Brown and Norman Siegel, Atlanta, Ga., for M. O. Sims, and others.

Ira DeMent, U. S. Atty., M. D. Ala., Montgomery, Ala., for the United States.

William J. Baxley, Atty. Gen., State of Ala., Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., and Julian D. Butler, Butler & Potter, Huntsville, Ala., Sp. Asst. Atty. Gen., for George C. Wallace, Mabel Amos and William J. Baxley.

James H. Hancock, Balch, Bingham, Baker, Hawthorne & Williams, Birmingham, Ala., for J. Richard Bennett, Jr., and Carolyn Golden.

Jack Crenshaw and B. M. Waller, Crenshaw & Waller, Montgomery, Ala., for Pierre Pelham and others.

James W. Garrett, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for L. D. Owen, Jr., and others.

William L. Irons, Speir & Irons, Birmingham, Ala., for Jefferson County Citizens Committee for Local Self-Government, its corporate officers and members.

Maurice Bishop, Bishop & Carlton, Birmingham, Ala., for Jefferson County, Ala.

Morris Dees, Jr. and Joseph J. Levin, Jr., Montgomery, Ala., Orzell Billingsley, Jr., Peter A. Hall, C. H. Erskine Smith, Birmingham, Ala., for E. D. Nixon, and others.

David Vann, Birmingham, Ala., for Ala. Independent Democratic Party, a corporation.

Robert S. Vance, Birmingham, Ala., pro se and for the Democratic Party and State Executive Committee.

Dieter J. Schrader, Huntsville, Ala., for J. Elbert Peters, etc.

Before RIVES, Circuit Judge, and THOMAS and JOHNSON, District Judges.

PER CURIAM:

This litigation consists of three consolidated cases, each presenting the same or similar questions of law and fact. In each case the plaintiffs [1] as citizens of the United States and of the State of Alabama, and as duly qualified and registered voters in Alabama and in various counties thereof, jointly and severally bring this action in their own behalf and in behalf of all other voters in Alabama who plaintiffs claim are denied the right of free and equal suffrage and of equal protection of the laws.[2]

In all three cases, the defendant Mabel Amos is sued in her capacity as Alabama's Secretary of State and as a State constitutional officer charged by law with certain duties and responsibilities in connection with the election of members of the Alabama Legislature. In *Sims* and *Nixon*, William J. Baxley is sued as Alabama's Attorney General, in which capacity he also is charged with performing certain functions in relation to the nomination and election of members of the Alabama Legislature; and in *Nixon* and *Peters*, George C. Wallace is sued as Governor of Alabama, the State officer charged with enforcing the Constitution and laws of the State. In *Nixon*, the Democratic Party of Alabama is a named defendant, while in *Sims* other defendants are named as follows: Defendants Harrell Hammonds, Perry O. Hooper, Paul J. Meeks, B. A. Reynolds

and Annette Bozeman are the duly elected, qualified and acting probate judges of Lowndes, Montgomery, Jefferson, Dallas and Marion Counties, respectively. They are sued as State constitutional officers and also as representatives of all probate judges in Alabama, who are charged with performing and exercising certain duties and powers with regard to the nomination and election of members of the Alabama Legislature. Defendant J. Richard Bennett, Jr., is the Chairman of the Alabama State Republican Executive Committee, and defendant Robert S. Vance is the Chairman of the Alabama State Democratic Executive Committee. Each is made a defendant in his official capacity as Chairman of the Executive Committee of his political party because, in such capacity, he is charged by law with performing certain duties in connection with the selection, nomination and election of members of the Alabama Legislature. Defendant Carolyn Golden is the Secretary of the Alabama State Republican Executive Committee and defendant H. G. Rains is the Secretary of the Alabama State Democratic Executive Committee. Each is sued as an officer of his political party because, in that position, each is charged by law with certain functions in connection with the selection, nomination and election of the Alabama legislators.

In bringing these actions, plaintiffs contend that the present Alabama Legislature is malapportioned and that, as a result, their voting strength is minimized or diluted, they are underrepresented in the State Legislature and they are denied the right to equal suffrage in contravention of the Fourteenth and Fifteenth Amendments to the United

---

1. The term "plaintiffs" will be used throughout this opinion to include the original plaintiffs in each case and all intervening plaintiffs. The term "defendants" likewise will be used to include the original defendants and all intervening defendants. By an order made and entered July 27, 1965, in C.A. No. 1744-N, the United States was designated to appear and participate as a party and as amicus curiae.

2. More specifically, the named plaintiffs in *Sims* are residents of Jefferson County; the named plaintiffs in *Nixon* are "Negro-Americans" residing in the "predominantly Negro ghettos" of Jefferson, Mobile and Montgomery Counties; and the named plaintiff in *Peters* is a resident of Madison County. The plaintiffs in all three cases bring their action in behalf of all voters throughout the State who are similarly situated.

States Constitution and of Sections 198, 199, 200, and 284 of the Constitution of Alabama (1901).[3] Plaintiffs seek to have Alabama's present apportionment scheme declared unconstitutional and the State statutes and federal court decision upon which it is based declared null and void and of no effect.[4] Plaintiffs urge that this Court adopt their proposed reapportionment plan and, thereby, reapportion the Alabama Legislature on the basis of state-wide single-member legislative districts, impartially selected, without regard to the racial or economic conditions of the district. Plaintiffs further ask that following this Court's adoption of a reapportionment plan, an election to effectuate such plan be held mid-term, that is, before the expiration of the four-year terms to which the members of the present Alabama Legislature were elected.

In response to the complaints filed in this litigation, defendants concur in plaintiffs' assertion that the Alabama Legislature is malapportioned. Nevertheless, they contend that this Court should allow further time for the State Legislature to reapportion itself. Defendants also oppose the single-member district reapportionment plan advanced by plaintiffs, and advocate, as alternatives, multi-district plans which several of said defendants have proposed. In

3. Section 198 provides:

The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative. The members of the house of representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States, which apportionment, when made, shall not be subject to alteration until the next session of the legislature after the next decennial census of the United States shall have been taken.

Section 199 provides:

It shall be the duty of the legislature at its first session after the taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of representatives and apportion them among the several counties of the state, according to the number of inhabitants in them, respectively; provided, that each county shall be entitled to at least one representative.

Section 200 provides:

It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other.

Section 284 provides in pertinent part:

. . . Representation in the legislature shall be based upon population, and such basis of representation shall not be changed by constitutional amendments.

Although they rely partially on Sections 198–200 as justifying their causes of action, plaintiffs also recognize that certain provisions within those sections conflict with the relief they seek, and, to the extent that they do so conflict, plaintiffs contend that they are invalid. For this contention plaintiffs rely on the principle stated in Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964), that "when there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls."

4. The current apportionment of the Alabama Senate was provided by Title 32, Sections 2 & 2(1), Code of Alabama (1940) (Supp.1967), while the current apportionment of the House of Representatives was effected by this Court in Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965).

addition, defendants deny that there is any constitutional requirement that, following reapportionment, an election be held before the expiration of the State legislators' current four-year terms. They contend that to allow the legislators to serve their full terms is equitable, fair and legally permissible.

These actions have been brought under Title 42, Sections 1983 [5] and 1988,[6] United States Code, to prevent the deprivation under color of state law of rights secured by the Constitution of the United States. Federal jurisdiction is properly grounded in Title 28, Section 1343(3).[7]

■■ A threshold question in these cases is whether the pending cases are proper ones for three-judge court jurisdiction, or whether they are more appropriately one-judge cases. A three-judge court is required for the granting of "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute. . . ." 28 U.S.C.A. § 2281. In the present litigation, plaintiffs clearly have invoked constitutional grounds in seeking to enjoin the operation of the Act of the Legislature which provides the current apportionment of the Alabama Senate and which

was approved by this Court in Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965). Thus, a constitutional issue is presented. Nevertheless, a three-judge court is neither required nor proper when the constitutional question involved is insubstantial. See Swift & Co. v. Wickham, 382 U.S. 111, 186 S.Ct. 258, 15 L.Ed.2d 194 (1965); Alabama v. United States, 314 F.Supp. 1319 (S.D.Ala.1970). The issue of a state statute's constitutionality may be insubstantial because previous decisions upheld the statute or because United States Supreme Court decisions obviously establish its invalidity. See Kirkland v. Wallace, 403 F.2d 413 (5th Cir. 1968).

■ Although prior decisions admittedly have rendered the substantiality of the constitutional issues involved here questionable, this Court feels that a three-judge court is still required for the following reasons. First, in Sims v. Baggett, this three-judge court expressly retained jurisdiction of all the matters now pending, and the latest complaint in the present litigation was filed seeking further relief in that case. In addition, when Nixon was filed in 1970, the same three judges were designated to sit on that case. More significantly, the complaint in that suit sought to enjoin the operation not only of a State statute but also of a provision of the Constitution

5. Title 42, Section 1983, United States Code, provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

6. Title 42, Section 1988 provides in pertinent part:
The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in

their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; . . . .

7. Title 28, Section 1343(3) provides:
The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; . . . .

of Alabama. The question involved, therefore, seems substantial.

Should this Court's decision to proceed as three judges prove incorrect, however, the judgment rendered here still will be valid as all three judges concur in the result. See Browder v. Gayle, 142 F. Supp. 707 (M.D.Ala.1956).

Jurisdictional matters having been settled, these causes proceeded to a hearing at which the parties presented evidence, both oral and documentary. The cases now are submitted upon the pleadings, the evidence, including several proposed reapportionment plans, and upon the briefs and arguments of the parties.

## I.

The history of the present litigation spans more than a decade. In order to understand and appreciate fully the posture of the cases now pending, therefore, it will be helpful to view them in their historical context.

This Court always has recognized that the primary responsibility for reapportionment rests with the Legislature and that no action on the part of this Court, which is not absolutely essential for the protection of plaintiffs' constitutional rights, should be taken before the Legislature of Alabama has had a reasonable opportunity to comply with its duty. Sims v. Frink, 208 F.Supp. 431 (M.D.Ala.1962). Indeed, the history of the present litigation reflects a trend of protracted judicial restraint, this Court acting only when confronted with totally inadequate legislative responses to, or complete disregard by the Legislature for, its constitutional mandate. The following is a cursory survey of that history.

Although the Constitution of Alabama required the Legislature to reapportion in accordance with the latest available federal census, prior to the initiation of the present litigation in 1961, Sims v. Frink, the last time the Legislature had reapportioned was in 1901. Sixty years and six decennial federal enumerations of the population of Alabama had passed without the Legislature having adhered to the command of its own State's Constitution. Nevertheless, in 1962, when plaintiffs in *Sims* sought an interlocutory injunction prohibiting defendants from holding primary elections in the malapportioned districts, this Court acknowledged the primacy of the Legislature's role in reapportionment and, although it retained jurisdiction, refused to issue the injunction, stating, "[t]here [still] is time [before the general election] for the Legislature of Alabama to comply with its duty . . . ." But having been afforded this additional reasonable opportunity to provide a fair and proper reapportionment, the Alabama Legislature again failed to remedy the "invidious discrimination" ingrained in the apportionment of the State's legislative districts. At that time this Court would have been justified in instituting a complete reapportionment plan of its own. Instead, however, recognizing the delicate relationship between federal courts and state legislatures, this Court effected only the minimum changes considered necessary to release the "stranglehold" on the Legislature and to permit it to reapportion itself in time to conduct the 1966 election of Alabama legislators. In this connection it was observed:

> The Court hopes that the moderate steps taken by this order may be enough to break the stranglehold. They certainly will not suffice as any permanent reapportionment. If they should prove insufficient to break the stranglehold, the Court remains under the solemn duty to relieve the plaintiffs and other citizens like situated from further denial of the equal protection of the laws. That much must be accomplished before there can be a final disposition of this case.

208 F.Supp. at 442.

Again jurisdiction of the case was expressly retained, and after the United States Supreme Court, in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), affirmed this Court's action, it remanded the case for further proceedings, specifically direct-

ing this Court "to take some further action should the reapportioned Alabama Legislature fail to enact a constitutionally valid, permanent apportionment scheme in the interim . . .," that is, in time to be used as the basis for conducting the 1966 election of State legislators. Subsequent to that decision, and because the Legislature again had failed to reapportion itself, this Court, in July of 1965, ordered the parties in *Sims* to file "their proposals for a judicial remedy designed to eliminate the 'invidious discrimination' presently existing in both Houses of the Legislature. . . . " Thereafter, the Alabama Legislature convened in special session and enacted bills to reapportion both the Senate and the House of Representatives. This Court accorded each of those acts "the most careful scrutiny and consideration," focusing on the constitutional prerequisite that reapportionment must be substantially on a population basis. Reynolds v. Sims, 377 U.S. at 568, 84 S.Ct. 1362, 12 L.Ed.2d 506; Alabama Const. art. 9, § 200 (1901). In its decision, filed on October 2, 1965, this Court adopted the multi-member district senatorial scheme of the Legislature, but, because it found the Legislature's House plan discriminatory against Negroes, it provided an alternative plan of multi-member House of Representative districts. Sims v. Baggett, *supra*.[8] This Court retained jurisdiction and ordered that:

> . . . the apportionment of the Alabama Legislature as herein ordered remain in effect without change, except by order of this Court, until the Legislature of the State of Alabama reapportions itself . . . after the next decennial census to be conducted in 1970. . . . [Unpublished decree.]

The next chapter in the development of the present litigation began in January of 1970, when certain "Negro-Americans" residing in the "predominantly Negro ghetto areas" of Montgomery, Mobile and Jefferson Counties filed a class action seeking preliminary and permanent injunctions against the election of State legislators from these three counties on a county-at-large basis. Plaintiffs contended that multi-member districting operated to minimize and cancel out their voting strength to the extent that they were deprived of equal protection of the laws and of the rights guaranteed them by the Fifteenth Amendment to the United States Constitution. Although this Court refused to issue a preliminary injunction because "it would be unreasonable and unwise to require any legislative reapportionment prior to the time fixed in [Sims v. Baggett], that is, prior to the first legislative session following the completion of the 1970 decennial census," this Court did order that jurisdiction be retained, that a hearing on the merits be postponed and that defendants' motions to dismiss be denied. In so ordering, the Court commented upon the merits of plaintiffs' complaint:

> . . . In our opinion, however, the evidence offered in support of the plaintiffs' claims, if such evidence is substantiated by the 1970 decennial census and by the further evidence then available, makes out a strong case for the consideration of the Legislature of Alabama.

Nixon v. Brewer, 49 F.R.D. 122, 126 (M.D.Ala.1970).

Following this order and the ensuing completion of the 1970 census, several events occurred in rapid succession. First, in June of 1971, plaintiff Peters filed a class action in the Northern District of Alabama, asking that the State Legislature be reapportioned and that mid-term elections be held. On July 12, plaintiffs in *Nixon* and *Sims* filed a motion for consolidation and asked for relief similar to that requested in *Peters*. Ten days later this Court granted the motion to consolidate and issued an order

---

8. Baggett was substituted for Frink as a party defendant by order made and entered August 25, 1965, pursuant to Rule 25(d), F.R.Civ.P.

**932**

requiring defendants to show cause why the Legislature was not under a mandatory constitutional duty to reapportion and if the Legislature should fail to perform its duty, why this Court would not then be under a duty to reapportion the Legislature constitutionally. On September 20, 1971, *Peters* was consolidated with *Sims* and *Nixon*.

Despite this Court's observation in *Nixon v. Brewer* [9] that plaintiffs' complaint made out a strong case, despite the 1970 census' clearly substantiating plaintiffs' claims, and despite the events set out above, the 1971 General Session of the Alabama Legislature adjourned without having met the mandates of both the Alabama and Federal Constitutions concerning reapportionment. On October 8, 1971, this Court set these three cases for hearing to commence December 2, 1971, and expressly notified the Legislature that it had until that date to enact a plan. Although the Legislature has convened since in special session, it has continued to fail to discharge its duty. With the *Nixon* plaintiffs' amendment of November 22, 1971, which added to the prayer for relief a request for state-wide single-member legislative districts, this litigation assumed its present posture. The Court proceeds, therefore, to the merits.

## II.

As set out above, plaintiffs ask that we adopt a plan of reapportionment applicable to both houses of the Alabama Legislature. Both plaintiffs and defendants have proffered plans for court-ordered reapportionment, though defendants also argue that this Court should allow further time for the State Legislature to reapportion itself.

The threshold inquiry, then, is whether this Court should now order reapportionment or further defer to the Alabama Legislature. For reasons to be hereinafter specified, we are convinced that further delay is inappropriate. In accordance with that finding and for other reasons set out below, we adopt and order the implementation of the plaintiffs' plan of reapportionment.

Plaintiffs also request that we cut short the terms of the existing legislators, which if left undisturbed expire in December, 1973, and that we order midterm elections to be held in November, 1972, pursuant to their plan. We deny this prayer for mid-term elections for the reasons discussed in Part III of this opinion.

### A. The Defendants' Plans

In Reynolds v. Sims, *supra*, the Supreme Court first held the principle of one man one vote applicable to state legislatures. On this point, the Court wrote:

> By holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, *as nearly of equal population as is practicable.*

377 U.S. at 577, 84 S.Ct. at 1389, 12 L.Ed.2d 506 (emphasis supplied). Since *Reynolds,* the body of case law speaking to questions of apportionment has burgeoned; the applicable principles seem clear.

■ In Swann v. Adams, 385 U.S. 440, 443–44, 87 S.Ct. 569, 572, 17 L.Ed. 2d 501 (1967), the Court announced that in a state apportionment scheme where there is any deviation from the norm of one man one vote, it becomes necessary "to articulate acceptable reasons for the variations among the populations of the various legislative districts with respect to both the senate and house of representatives." Furthermore,

9. Wallace was substituted for Brewer as a party defendant by order made and entered July 22, 1971, pursuant to Rule 25(d), F.R.Civ.P. On the same date, Amos was substituted for Baggett in the *Sims* case, as were numerous other parties, in both consolidated cases, who had succeeded to office.

the burden of demonstrating viable justification for population variance falls upon the state, not upon those seeking reapportionment. Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967); Swann v. Adams, *supra;* Wold v. Anderson, 327 F.Supp. 1342 (D.Mont., June 11, 1971).

■ Perhaps the justification most often advanced by the states for permitting deviation from the ideal of one man one vote is the necessity for maintaining the integrity of political subdivisions such as counties. As a rule the interests of precise equality of representation and of maintenance of county lines are incompatible. Accordingly some variance from perfect equality may be tolerated in order to permit to an extent allowable that political subdivisions remain undisturbed. However, there are severe limitations on the amount of deviation to be allowed. In *Reynolds,* the Court pointed out that:

> . . . careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired.

377 U.S. at 581, 84 S.Ct. at 1392, 12 L.Ed.2d 506.

■ In Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), a congressional redistricting case, the Court held that no amount of deviation, however slight, is *per se de minimis.* The *Kirkpatrick* standard is exacting but is founded on sound principles:

> (1) There is "no nonarbitrary way to pick a cutoff point at which population

variances suddenly become *de minimis*"; and

> (2) "to consider a certain range of variance *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable."

394 U.S. at 531, 89 S.Ct. at 1229. In the context of state apportionment, perhaps a greater percentage of deviation may be allowed in the interest of preserving representation for political subdivisions than would be allowed in a scheme of federal districting. For the Court in *Reynolds* averred that "[s]omewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting." 377 U.S. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d 506. Nonetheless, even with respect to state apportionment no amount of deviation should be considered *per se de minimis.*

■ To summarize the constitutional requirements declared by the Supreme Court with respect to state apportionment schemes:

> (1) One man's vote must, "as nearly as practicable," be equal in weight to the vote of any other citizen of his state;

> (2) no amount of population variance is *per se de minimis,* though in actuality greater deviation may be allowed in the context of state apportionment than in the context of congressional districting; and

> (3) any deviation from the ideal of one man one vote must be justified by the state as fostering the effectuation of a legitimate state policy.

Bearing these principles in mind, we now turn to an analysis of the defendants' plans.

On behalf of the defendants, the Attorney General of Alabama has presented three plans of reapportionment to this Court, and on behalf of certain of the defendant-intervenors, Pierre Pelham has proffered one plan. All four

plans utilize a multi-member district form of representation, provide for 106 House seats and 35 Senate seats, and hold absolute the sanctity of county lines. As noted above, maintenance of county lines and achievement of mathematical equality in representation are often incompatible. With respect to the four plans submitted by the defendants in these cases, that incompatibility has produced wide variances from the ideal of one man one vote.

In Alabama the number of people ideally entitled to elect one house member is 32,492 where the scheme provides for 106 house seats. If fewer than that number of people are given one representative, they are overrepresented; conversely, if more than 32,492 people are allowed only one representative, they are underrepresented. In a senate plan composed of 35 seats, the ideal population entitled to one senator is 98,406. The same notions of overrepresentation and underrepresentation apply.

The following table serves to indicate the percentages of deviation in each of the defendants' four plans:

TABLE I

|  | Range of % of Deviation [10] in House | Total Deviation [11] in House | Range of % of Deviation in Senate | Total Deviation in Senate |
|---|---|---|---|---|
| Attorney General's Plan #1 [12] | +18.70% to −29.15% | 47.85% | +17.49% to −20.93% | 38.42% |
| Attorney General's Plan #2 | +15.20% to −14.77% | 29.97% | + 6.37% to −17.91% | 24.28% |
| Attorney General's Plan #3 | +26.79% to −25.55% | 52.34% | +10.77% to −20.93% | 31.70% |
| Pierre Pelham's Plan | +13.45% to −15.20% | 28.65% | +14.39% to −11.59% | 25.98% |

Defendants assert that because the plans tabulated above preserve the integrity of county lines, they satisfy constitutional standards, even though they exhibit wide discrepancies from equality of representation. We cannot accept that contention.

In Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Supreme Court upheld a plan of apportionment for Rockland County, New York, which evidenced a total deviation of 11.9% (the range of deviations +4.8% to −7.1%) from the standard of one man one vote. In doing so, the Court observed:

> . . . [L]ocal legislative bodies frequently have fewer representatives than do their state and national counterparts and . . . some local legislative districts may have a much smaller population than do congressional and state legislative districts . . . [these facts] lend support to the argument that slightly greater percentage deviations may be tolerable

10. In this column of the Table, a positive number indicates the percentage of deviation for the most overrepresented district while a negative number indicates the percentage of deviation for the most underrepresented district.

11. Total deviation constitutes the sum of the absolute percentages of deviation for the most overrepresented and the most underrepresented districts.

12. It should be noted that the Attorney General's Plan # 1 was actually passed by the Alabama House of Representatives during its last session as H.B. 1980, The McCorquodale Plan.

for local government apportionment schemes, cf. Reynolds v. Sims, *supra,* at 578.

403 U.S. at 185, 91 S.Ct. at 1907, 29 L.Ed.2d 399. The Court went on to say:

> We emphasize that our decision is based on the long tradition of overlapping function and dual personnel in Rockland County government and on the fact that the plan before us does not contain a built in bias tending to favor particular political interests or geographic areas. *And nothing we say today should be taken to imply that even these factors could justify substantially greater deviations from population equality.*

403 U.S. at 187, 91 S.Ct. at 1908, 29 L.Ed.2d 399 (emphasis supplied).

Several courts have invalidated state apportionment schemes which preserved county lines at the expense of wide population variances among the various legislative districts.[13] These decisions appear to follow the controlling constitutional principles. In sum, the Court in *Reynolds* announced that equal representation must be the "overriding objective" and cannot be "submerged" in an effort to preserve county lines. Furthermore, in *Abate* the Supreme Court stated that, in the context of local apportionment, preservation of political subdivisions cannot justify a deviation of substantially more than 11.9% and that where state apportionment schemes are at issue less leeway is to be afforded.

Owing to both *Reynolds* and *Abate* and to the various other court decisions noted in footnote 13, this Court cannot approve any of the plans submitted by defendants in these cases.

There is an additional reason for refusing to approve any of the defendants' plans. In Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971),[14] a case involving reapportionment of the Mississippi Legislature, the Court stated, "We agree that when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." The defendants ask that we give credence to a plan predicated on an at-large scheme of representation. We cannot accede to that request.

In Chavis v. Whitcomb, 305 F.Supp. 1364 (S.D.Ind.1969), rev'd on other grounds, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), the district court implemented its own reapportionment plan utilizing single-member districting. The court's justification for instituting such a plan was its finding that multi-member schemes inherently discriminate on the basis of race. The Supreme Court reversed, holding that multi-member plans do not inherently discriminate. In these cases we choose to follow the general rule enunciated in *Connor,* not on the ground that to utilize multi-member districting would inherently discriminate against blacks, but primarily on the ground that to do otherwise would sacri-

---

13. Hensly v. Wood, 329 F.Supp. 787 (E.D. Ky., July 26, 1971) (county lines do not justify 25.5% variance in the house or 18.92% deviation in the senate) ; Wold v. Anderson, 327 F.Supp. 1342 (D. Mont., June 11, 1971) (county lines do not justify 23% deviation in the house or 37.06% variance in the senate) ; Scrimminger v. Sherwin, No. C–2257–70 (Sup. Ct.N.J., May 18, 1971) (county lines do not justify 28.83% deviation in the senate) ; Howell v. Mahan, 330 F.Supp. 1138 (E.D.Va., 1971) (county lines do not justify 23.6% variation in the house) ; Chavis v. Whitcomb, 305 F. Supp. 1364 (S.D.Ind.1969) (county lines do not justify 24.78% deviation in the house or 28.20% variance in the senate), rev'd on other grounds, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). (In reversing, the Supreme Court noted that the district court had been correct in ordering state-wide reapportionment on the basis of the amount of existing population variance but that the lower court had erred in other respects.)

14. It may be noted that the Supreme Court decisions in Connor v. Johnson and in Chavis v. Whitcomb, *supra,* footnote 13, were announced within four days of each other, i. e., on June 3, 1971 and June 7, 1971, respectively.

fice the mathematical precision which can be achieved in Alabama only by a single-member plan. Secondarily, we do note that *Whitcomb* arose in Indiana, a State without the long history of racial discrimination evident in Alabama.[15] Thus we feel justified in pointing out that in Alabama it is reasonable to conclude that multi-member districts tend to discriminate against the black population.

▇ In sum, all four of the defendants' plans are unacceptable since, in conjunction with their discriminatory effect, they fall considerably short of guaranteeing to each citizen of Alabama that his vote "is approximately equal in weight to that of any other citizen in the State." *Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1390, 12 L.Ed.2d 506.

B. *The Plaintiffs' Plan*

Plaintiffs' plan is comprised of 105 single-member House districts and of 35 single-member Senate districts. Before evaluating the plaintiffs' plan in light of constitutional standards, we must consider that it calls for a 105 member House where currently the Alabama House of Representatives consists of 106 seats. The rationale for adopting a plan embodying a 105 member House is clear. Since 35, the number of Senate seats, divides into 105 exactly three times, plaintiffs' plan creates Senate districts simply by combining three contiguous House districts. Therefore, once the 105 House districts are established, with a minimum amount of population variance, it is an easy task to construct the Senate districts. Furthermore, under the present system a resident of County "A" might be grouped with residents of Counties "B" and "C" to create a House district, while he is grouped with residents of Counties "D", "E" and "F" to create a Senate district. Under the plaintiffs' plan an entire House district becomes part of a larger Senate district.

▇ Although the efficacy of reducing the number of seats in the Alabama House to 105 is clear, the question remains whether this Court has the power to effect such a reduction. We hold that this Court has the necessary power. The Alabama Constitution is in nowise inconsistent with provision for a 105 man House. Article 9, Section 198, provides in relevant part:

The house of representatives shall consist of not more than one hundred and five members, unless new counties shall be created, in which event each new county shall be entitled to one representative.

It is clear beyond cavil that this section establishes only a maximum number of House seats—105 plus one for any county added after 1901—not a minimum. Subsequent to the passage of the Constitution of 1901, Alabama has gained only one county. Accordingly, the number of representatives was set at 106.[16] In the context of the present number of counties in Alabama, the State Constitution merely requires that there be at least 67 representatives (one for each county) and not more than 106.

Moreover, case law supports our conclusion. In *Klahr v. Goddard*, 250 F. Supp. 537 (D.Ariz.1966), aff'd sub nom., *Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971), the district court devised a temporary reapportionment plan reducing the number of house members from 80 to 60. The court remarked that "[p]rovision for a House of 60 members is consistent with the [state] constitutional provision for a House 'not to exceed 80 members.' " 250 F.Supp. at 547. The district court further justified its action as a method of achieving the standards of equal representation as nearly as practicable and pointed out that a reduction in house seats in the circumstances there present "provide[d] a desirable simplicity." *Id.* The Supreme Court affirmed and in

---

15. See this Court's discussion and citation of cases evidencing this history in *Sims v. Baggett, supra.*

16. Acts of Alabama, Act No. 27, H. 260, p. 44 (1903).

no way undermined the soundness of the district court's plan which reduced the then current number of representatives. Similarly, in Herwig v. Thirty-Ninth Legislative Assembly, 246 F.Supp. 454 (D.Mont.1965), the court devised a plan which provided for 55 senators despite the fact that the number of senators then in office was 56.

Accordingly, we see no difficulty in adopting a plan that reduces the present number of House seats from 106 to 105. Such a plan is particularly valid where the reduction promotes simplicity and is justified by logical reasons.

We now consider whether the plaintiffs' plan meets constitutional standards.

In a scheme of apportionment in which there are 105 House seats, the ideal population per House district is 32,802. With respect to a Senate plan which contemplates 35 Senate seats, the ideal population per district is 98,406. The following table analyzing the plaintiffs' plan illustrates the percentages of deviation from an ideal population per district.

TABLE II

|  | Range of Percentage of Deviation [17] | Total Deviation [18] | Ratio of Most Populated District to Least Populated District |
|---|---|---|---|
| House | +1.08% to −1.15% | 2.23% | 1.02 to 1 |
| Senate | +0.67% to −0.72% | 1.39% | 1.01 to 1 |

In the House portion of the plan, 100 of the 105 legislative districts vary less than 1.00% from perfect mathematical equality of representation. In the remaining five districts the population variance is less than 1.15%. With respect to the Senate portion of the plan, all 35 of the districts exhibit deviations of less than 1.00% from the norm of one man one vote. Any variation which does exist is the product of mathematical necessity. No multi-member plan could achieve such mathematical equality of representation. Accordingly, plaintiffs' plan satisfies the command of Reynolds v. Sims, supra, that one man's vote, "as nearly as practicable," be equal to another's.

Considering the plaintiffs' plan as a whole, we find that it passes constitutional muster in all respects. There is no federal constitutional requirement that a plan of state reapportionment maintain the integrity of political subdivisions, though a certain amount of deviation from precise equality of representation is allowed in the interests of preserving such integrity. Thus we must determine whether on balance so many county lines are vitiated as to require that the plaintiffs' plan be rejected.

In fashioning their plan, plaintiffs employed seven criteria: (1) that there be single member districts; (2) that the population variance among the individual districts be held to a bare minimum; (3) that county lines be crossed in as few instances as possible; (4) that all areas of each district be contiguous; (5) that each district be as compact as possible

17. The positive figures represent the percentage by which the least populated district is overrepresented. Conversely, the negative values indicate the percentage by which the most populated district is underrepresented.

18. Total Deviation constitutes the sum of the absolute percentages of deviation for the most overrepresented and the most underrepresented legislative districts.

(i. e., not overly elongated); (6) that on a broad, state-wide basis the districts be constructed in such a manner as to insure proper representation of the urban and the rural populations; and (7) that the selection of a starting point around which each district was to be constructed be made at random. Plaintiffs eschewed consideration of the racial, economic and ethnic composition (and concentration) of the population in devising their plan. By selecting a starting point at random, plaintiffs have obviated any hint of racial gerrymandering.

As noted above, the plan achieved by plaintiffs exhibits minimal variance from the ideal of one man one vote. It also comports with the general rule discussed above that a court-adopted plan of reapportionment be predicated on single-member districts. Furthermore, it is the use of single-member districts which has enabled plaintiffs' plan to approach so closely precise equality of representation.

■. The standard expounded in *Reynolds* must here be emphasized: If equality of population among the various voting districts is submerged as the controlling consideration, a plan becomes unacceptable. Plaintiffs' plan crosses county lines in as few instances as possible; it substantially maintains the integrity of the counties.[19] More importantly, it achieves near precision in guaranteeing that one man's vote is essentially equal to that of another. We emphasize that to obtain the primary goal of equal representation it is impossible

---

19. A brief look at some statistics is helpful.

*The House portion of the Plaintiffs' Plan:*

In Alabama there are 37 counties which have populations of less than 32,802 and which ideally should be placed wholly within one district. Of those 37, 24 are within one district (64.86%), 11 are divided into two districts (29.73%), one is divided among three districts (2.70%), and one is divided among four districts (2.70%).

There are 21 counties which have populations between 32,802 and 65,604 and which ideally should be divided between two districts. Of those 21, 14 are divided between two districts (66.67%), six are divided among three districts (28.57%), and one is divided among four districts (4.76%).

There are three counties which have populations between 65,604 and 98,406 and which ideally should be divided among three districts. Of those three, one is divided among three districts (33.33%) and two are divided among four districts (66.67%).

There are two counties which have populations between 98,406 and 131,208 and which ideally should be divided among four districts. Of those two, one is divided among four districts (50.00%) and one is divided among six districts (50.00%).

There are two counties which have populations between 164,010 and 196,812 and which ideally should be divided among six districts. Of those two, both are divided among six districts (100%).

There is one county which should ideally be divided among ten districts, but it is divided among 12.

There is one county which should be divided among 20 districts, but it is divided among 21.

Overall, then, in 62.85% of the cases a county is divided among the ideal number of House districts, and in 25.74% of the cases a county is divided among one more than the ideal number of districts.

*The Senate portion of the Plaintiffs' Plan:*

In Alabama there are 61 counties which have populations of less than 98,406 and which ideally should be placed wholly within one Senate district. Of those 61, 38 are placed wholly within one district (62.3%), 20 are divided between two districts (32.8%), and three are divided among three districts (4.9%).

There are four counties which should be divided between two districts. Of those four, two are divided between two districts (50%) and two are divided among three districts (50%).

There is one county which should be divided among four districts, and it is so divided.

There is one county which should be divided among seven districts, but it is divided among eight.

Overall, then, in 61.2% of the cases a county is divided among the ideal number of Senate districts, and in 34.3% of the cases a county is divided among one more than the ideal number of districts.

to preserve county lines in all, or even in nearly all, instances. The plaintiffs' plan draws a fair and reasonable balance between the competing interests of affording equal representation and of maintaining county lines. Boundary lines are sacrificed only where absolutely necessary to satisfy the constitutional requirement of one man one vote.[20]

■■■■ Defendants also criticize the plaintiffs' plan on the ground that its voting districts do not coincide with existing precincts. We do not find this objection persuasive. Since we are refusing to order mid-term elections, Alabama's election officials have adequate time in which to devise a methodology whereby each man's vote may be properly counted. In most instances, people can vote in their old precincts. With respect to those instances in which old precinct lines do not coincide with new legislative district boundaries, several alternatives are available, probably the most attractive of which is to devise new precinct lines which would comport with the new districts. There is nothing unduly burdensome in constructing new precincts.

In a recent Louisiana case, Bussie v. The Governor of Louisiana, 333 F.Supp. 452 (E.D.La., Aug. 24, 1971), the court did order a plan of state reapportionment predicated on precinct lines. However, precincts were used only because "to do otherwise would have meant splitting precincts in the face of impending elections." The next state-wide election of legislators in Alabama will not occur until 1974. Accordingly, we cannot sacrifice the equality of representation ac-

corded in the plaintiffs' plan merely to allow existing voting precincts to be preserved.

The plaintiffs, in composing their plan, used census enumeration districts (hereinafter "ED's") as the primary tool. The smallest geographical areas for which the Census Bureau reports population statistics are the ED and, in a very few highly urbanized areas, the "block." Population figures are not compiled along precinct lines. In order to determine the population of a particular precinct it would be necessary to begin with the population statistics of ED's or blocks and from those figures to project the population of the precinct. The use of that type of guesswork obviously sacrifices accuracy. None of the parties have attempted to devise a plan based upon such projections. We have noted that the principles announced in *Reynolds* cannot be subverted in order to preserve county lines. Certainly we cannot allow such subversion in the interest of maintaining existing precincts.[21]

Aside from avoiding problems of inaccuracy engendered by using precincts as the foundation of a reapportionment plan, another advantage results from employing ED's. In each subsequent census the same ED's will in large measure be maintained. Accordingly the task of reapportioning in the future will be facilitated.

In sum we find that, unlike the defendants' plans, the plaintiffs' plan satisfies all requirements of the federal Constitution. Any administrative inconven-

---

20. In approving the crossing of county lines, we necessarily fail to give effect to that part of Art. IX, § 200, Alabama Constitution of 1901, which forbids splitting any county between two or more legislative districts. We find that the requirements of equal protection necessitate, in some instances, that county lines give way in drawing legislative districts. To the extent that Section 200 forbids such, it must yield for "when there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls." Rey-

nolds v. Sims, 377 U.S. at 584, 84 S.Ct. at 393, 12 L.Ed.2d 506.

21. Defendants also claim that adoption of the plaintiffs' plan requires that election officials bring their voter lists up to date to ensure that each man's vote is counted in the proper legislative district. It is true that current voter lists are necessary. However, we cannot agree that to require such is unduly burdensome. Alabama election officials are required to have up-to-date lists irrespective of whether new legislative districting is implemented.

iences precipitated by its implementation can be resolved prior to the 1974 election.[22]

Since this plan will not actually take effect until 1974, additional time could arguably be afforded the Alabama Legislature to permit that body to reapportion itself. We refuse to defer further to the Legislature for three reasons. First, the protracted history of this litigation, as set out in Part I of this opinion, demonstrates that the State has had more than adequate time in which to adopt a plan of reapportionment. The Alabama Constitution itself commands that reapportionment be accomplished in the next regular session following each decennial census. Art. 9, § 199, Alabama Constitution of 1901. Moreover, on March 4, 1970, this Court issued an order in this litigation stating that "[a]fter the completion of the 1970 census the Legislature can be expected with reasonable dispatch to reapportion both the House and the Senate in such a manner as will not deprive any voter of the equal protection of the laws as guaranteed by the Fourteenth Amendment." In our opinion the Legislature has been given every reasonable opportunity to perform its duty. Second, this Court is aware that implementation of the plaintiffs' plan necessitates completion of several time-consuming administrative tasks such as updating present voting lists. In order to afford ample time in which to accomplish those tasks, we feel compelled to adopt a plan now and to order local officials to begin undertaking these duties immediately. Third, and last, by adopting plaintiffs' plan at this point, we allow an adequate period for all parties to exhaust an effective appeal.

Having considered the merits of the various plans and having adopted the plaintiffs' plan as the plan of this Court, we now focus attention to plaintiffs' request that we order mid-term elections to be held in November, 1972.

### III.

We have no doubt that this Court has the power to order mid-term elections. See, e. g., Howard v. Adams County Board of Supervisors, 453 F.2d 455 (1971); Hall v. Issaquena County Board of Supervisors, 453 F.2d 404 (1971); Chavis v. Whitcomb, supra; Mann v. Davis, 238 F.Supp. 458 (E.D.Va. 1964), aff'd, 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698 (1965); Reynolds v. State Election Board, 233 F.Supp. 323 (W.D.Okl.1964); Moss v. Burkhart, 220 F.Supp. 149 (W.D.Okl.1963), aff'd sub. nom., Williams v. Moss, 378 U.S. 558, 84 S.Ct. 1907, 12 L.Ed.2d 1026 (1964). We recognize, however, that the exercise of such power is discretionary.

In light of all the circumstances surrounding these cases, we find that ordering mid-term elections would be inappropriate. As stated earlier, implementation of the plaintiffs' plan requires completion of several weighty administrative tasks. For example, election officials must compile new voter lists for the entire State. Similarly, since the plaintiffs' plan is predicated on population figures for enumeration districts rather than on population figures for the old precincts, election officials must either find a method of accommodating the old precincts to the new apportionment scheme or draw new precinct lines to comport with the new legislative districts. In order to conduct an election in November, 1972, the above administrative duties, and others, would of necessity have to be accomplished in time

22. Detailed maps outlining the various House and Senate districts as herein ordered are on file with the Clerk's Office of this Court. Copies of all these maps will be attached to the opinion and decree furnished all defendants with the exception of probate judges. Each probate judge will be furnished a set of maps that will enable him to establish, with certainty, enumeration districts and legislative district lines. In the event any election official encounters difficulty in establishing enumeration district lines or legislative district lines, the Clerk of this Court and the officials of the United States Bureau of Census stand ready to render whatever assistance may be necessary.

for candidates to qualify in March, 1972, and to run in the May primary. In our opinion, to require completion of these tasks in so short a time would place too great a burden on the State's election officials.

Moreover, in Reynolds v. Sims, 377 U.S. at 583–84, 84 S.Ct. at 1393, 12 L. Ed.2d 506, which not only is binding precedent but also is the law of these cases, the Court commented on the question of the required frequency of reapportionment:

> . . . Limitations on the frequency of reapportionment are justified by the need for stability and continuity in the organization of the legislative system, although undoubtedly reapportioning no more frequently than every 10 years leads to some imbalance in the population of districts toward the end of the decennial period and also to the development of resistance to change on the part of some incumbent legislators. In substance, we do not regard the Equal Protection Clause as requiring daily, monthly, annual or biennial reapportionment, so long as a State has a reasonably conceived plan for periodic readjustment of legislative representation. While we do not intend to indicate that decennial reapportionment is a constitutional requisite, compliance with such an approach would clearly meet the minimal requirements for maintaining a reasonably current scheme of legislative representation. And we do not mean to intimate that more frequent reapportionment would not be constitutionally permissible or practicably desirable. But if reapportionment were accomplished with less frequency, it would assuredly be constitutionally suspect.

In Sims v. Baggett, *supra,* we ordered a plan of reapportionment which took effect in 1966. Thus, the current Alabama apportionment scheme has been in effect for only about one-half of the ten years adjudged permissible by the Supreme Court in *Reynolds*. Consequently, we feel that ordering mid-term elections to be held in 1972 would unjustly intrude upon "the organization of the State legislative system." The plan of apportionment which we here adopt will take effect in 1974, only eight years from the inception of the present plan. Notions of comity dictate that courts not interfere with state government unless absolutely necessary. To the extent that the implementation of this plan will interfere, we find, as above demonstrated, that such interference is constitutionally required.

This Court specifically retains jurisdiction of this matter.