I strongly disagree with this Court's affirmance of the summary judgment in this important case.
The standard of review for a summary judgment is well-settled. *Page 169 
 "We review a summary judgment de novo. . . . A summary judgment is proper where `the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala.R.Civ.P. . . . [A] party moving for a summary judgment always bears the initial burden of informing the trial court of the basis for its motion and indentifying those portions of the record that it argues demonstrate the absence of a genuine issue of material fact."
Northwest Florida Truss, Inc. v. Baldwin County Commission, 782 So.2d 274,276 (Ala. 2000).
The defendants presented only three pieces of evidence to support their argument for a summary judgment: (1) the October 15, 2001, letter from the United States Department of Justice indicating that Act No.2001-727, Ala. Acts 2001, had received preclearance under § 5 of the Voting Rights Act; (2) 1903 records of the State of Alabama Department of Archives and History, showing the population of Alabama counties from 1800 to 1900; and (3) an affidavit of Ms. Bonnie P. Shanholtzer, authenticating the reapportionment committee guidelines for the legislative, state board of education, and Congressional redistricting for the State of Alabama.
These submissions lack any relevance to the question before us in this case, which is whether Act No. 2001-727 violates Art. IX, § 200, Ala. Const. of 1901. Preclearance from the United States Justice Department demonstrates that the plan is probably constitutional under the Voting Rights Act of 1964 prohibiting racial discrimination, but here, where no racial discrimination is alleged, preclearance does not help us in evaluating the state constitutional claims under Art. IX, § 200.
The population records from 1903 were submitted ostensibly to demonstrate that the State permitted wide deviations in the populations of districts at the time of the adoption of Art. IX, § 200. However, population deviations before the effective date of the 1901 Constitution are simply irrelevant. First, the language of Art. IX, § 200 stipulates that that section is to be applied after each decennial census; thus, it first applied to redistricting in 1910. Second, in Reynolds v. Sims, 377 U.S. 533, 569 (1964), the United States Supreme Court later confirmed the finding of a lower court that the Alabama Legislature had not adhered to federal or state constitutional guidelines regarding apportionment for over 60 years and ordered reapportionment according to its "one-man, one-vote" analysis. At the time Reynolds v. Sims was decided, the State had not reapportioned its districts since 1901; therefore, in 1903 the districts had never been apportioned "as nearly equal to each other in the number of inhabitants as may be," Art. IX, § 200. See Sims v. Frink, 208 F. Supp. 431, 435 (M.D.Ala. 1962) (three-judge panel). Indeed, existing population deviations from 1903 until 1964 were the very reason the United States Supreme Court found Alabama's legislative scheme to be in violation of the "one-man, one-vote" rule propounded in Reynolds.
Nevertheless, the trial court cited the population deviation of districts at the time of the adoption of Art. IX, § 200, as its main evidence in support of its holding that Art. IX, § 200, does not require strict population equality among senate districts. Stated alternatively, the trial court used a population-deviation scheme that violated the federal constitution to demonstrate that the present scheme does not violate *Page 170 
the State constitution. This conclusion is clearly contrary to the rules of constitutional interpretation: A state "`may, in fact, provide more protection for private rights than the United States Constitution requires,'" but it cannot provide less. Brooks v. Hobbie, 631 So.2d 883,889 (Ala. 1993), quoting Moore v. Mobile Infirmary Ass'n, 592 So.2d 156,170 (Ala. 1991).
Finally, the reapportionment committee guidelines merely show what the Legislature feels to be the criteria that must be met to satisfy federal and state constitutional standards in executing a redistricting plan. The guidelines stipulate that "the relative population deviation for any legislative . . . district should not exceed plus or minus five percent (+-5%)," but this rule exists expressly to ensure "that the overall deviation in the plan" meets the "permissible overall deviation" according to "federal judicial decisions." Reapportionment Committee Guidelines for Legislative, State Board of Education, and Congressional Redistricting, II.1.b. (emphasis added). This rule does not address whether the requirements of Art. IX, § 200, have been met. Moreover, whether a legislative scheme has met federal or state constitutional requirements is not up to the Legislature if the scheme is challenged in court, because the court, not the legislature, must interpret constitutional requirements.
Furthermore, a review of the guidelines shows that its stipulations were not followed in structuring this redistricting plan. The guidelines specifically state that "proponents of Legislative and State Board of Education reapportionment plans should establish as a high priority minimizing population deviations among districts." Guidelines, II.1.b. The plus-or-minus-five-percent range is intended as a last resort, not a goal, when designing a redistricting plan. The guidelines require that any deviations in population contained in a proposed plan must be justified in a written "detailed explanation" that shows how the deviations "further rational state policies." II.1.c. Maintaining county boundaries is not only listed as one of those "rational state policies," but is also a state constitutional requirement under Art. IX, § 200. See Guidelines, IV.7.b. In other words, according to the guidelines, the Legislature must strive to achieve maximum equality in district populations while maintaining county boundaries. If there are deviations, a detailed written explanation should be submitted of how those deviations further state policies, yet no explanation was given to the trial court here, even though the deviations under the redistricting plan clearly disregarded the goal of maintaining county boundaries.
None of the evidence submitted by the defendants addresses the state constitutional question at issue and some of the evidence even shows a clear violation of the legislature's own reapportionment guidelines. Nevertheless, the trial court cited all of these submissions as undisputed facts in support for granting the defendants' motions for a summary judgment. This misapplication, alone, of the evidence to the issue of state constitutionality merits reversing the summary judgment in this case.
But even if the defendants had met their initial burden, the arguments and evidence presented by the Rice plaintiffs constitute substantial evidence creating a genuine issue of material fact. Once the moving party makes an initial showing in favor of a summary judgment, the burden shifts to the nonmoving party to present substantial evidence creating a genuine issue of material fact in order to avoid a summary judgment. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment *Page 171 
can reasonably infer the existence of a fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989); see also Ex party Trinity Indus., Inc., 680 So.2d 262, 269 (Ala. 1996).
Initially, the Rice plaintiffs pointed out, and the defendants conceded, that this is an issue of first impression in Alabama. Only three cases have been decided construing the meaning of the requirements of Art. IX, § 200; all of those cases are federal district court cases. See Sims v. Amos, 336 F. Supp. 924 (M.D.Ala. 1972); Burton v. Hobbie, 543 F. Supp. 235 (M.D.Ala. 1982); and Burton v. Hobbie,561 F. Supp. 1029 (M.D.Ala. 1983). These cases provide conflicting conclusions as to how much population deviation is permitted by the language "as nearly equal to each other in the number of inhabitants as may be." Art. IX, § 200. Because there are no controlling cases on what standard of deviation the Alabama Constitution permits, a plus-or-minus-five-percent deviation under the legislative reapportionment scheme simply has no legal support.
Additionally, the Rice plaintiffs' written response to the motion for a summary judgment submitted by Senators Barron and Sanders raises several genuine issues regarding the reapportionment plan. The trial court curiously considered neither Senators Barron and Sanders's motion for a summary judgment nor the Rice plaintiffs' response — ruling that both were untimely. The Barron and Sanders motion was filed on January 9, 2002; the trial court did not rule on their motion to intervene in the case until the January 10 hearing. The summary-judgment motion of those defendants could not even have been officially filed with the court until January 10; therefore, holding that their motion for a summary judgment was untimely makes no sense, particularly when the trial court heard arguments on the motion from their counsel at the January 10 hearing.
The motion for a summary judgment filed by Senators Barron and Sanders was filed on January 10; the Rice plaintiffs filed their response to that motion on January 17, certainly a timely response. In fact, the trial judge told the Rice plaintiffs at the January 10 hearing that they could file their response by January 24. Despite this statement by the trial court, the court subsequently ruled on January 28 that the response was untimely, and the court did not consider in its decision the arguments made in the motion or response or the affidavits submitted therewith.
Those affidavits clearly show that the redistricting plan at issue had not been submitted to the permanent legislative committee on reapportionment, the committee charged with considering those issues and that the plan did not conform fully with the legislative committee guidelines. As explained above, those guidelines clearly provide that deviations in population require a detailed written explanation justifying the deviations as furthering rational state goals. The guidelines also state that redistricting plans should strive to maintain county boundaries. (5) Although this redistricting plan failed in all of these respects, the trial court still found no genuine issues of material fact.
However, even if we ignore the Rice plaintiffs' response to the summary-judgment motion of Senators Barron and Sanders, their remaining arguments *Page 172 
demonstrate the constitutional problem with the redistricting plan in this case, i.e., the plan contains substantial deviations in population and disregards county boundaries. This Court finds that the integrity of county boundaries is not in issue because the Rice plaintiffs did not make the argument at trial; however, I believe their arguments relative to Art. IX, § 200, were sufficient to place the issue before us, because the integrity of county boundaries is an integral part of § 200. The Rice plaintiffs state in their complaint that Act No. 2001-727
violates Art. IX, § 200, of the Alabama Constitution of 1901. Although the Rice plaintiffs stress the requirement that senatorial districts "shall be as nearly equal to each other in the number of inhabitants as may be," the complaint itself — combined with the defendants' submission of the redistricting map — mandates that this Court consider, and the trial court should have considered, the fact that the redistricting plan splits nearly half of the State's 67 counties, when Art. IX, § 200, explicitly states that "[n]o county shall be divided between districts . . . ."
The federal district court for the Middle District of Alabama ordered a relaxation of the "no-division" provision of Art. IX, § 200, regarding county boundaries, in Sims v. Amos, 336 F. Supp. 924, 939
(M.D.Ala. 1972), because the "one-person, one-vote" rule instituted by the United States Supreme Court has priority over the State requirement of maintaining political boundaries. However, in relaxing the standard, the court made it clear that "the requirements of equal protection necessitate, in some instances, that county lines give way in drawing legislative districts." 336 F. Supp. at 939 n. 20 (emphasis added). Indeed, "[b]oundary lines are sacrificed only where absolutely necessary to satisfy the constitutional requirement of one man one vote."336 F. Supp. at 939 (emphasis added). Consequently, the "no-division" provision of Art. IX, § 200, cannot be arbitrarily disregarded by the legislature.
The district court in Sims explained that "the justification most often advanced by the states for permitting deviation from the ideal of one man one vote is the necessity for maintaining the integrity of political subdivisions such as counties." 336 F. Supp. at 933. Indeed, the United States Supreme Court observed in Reynolds:
 "It may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State. . . . Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting. . . .
 "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme."
377 U.S. at 578.
Thus, the United States Supreme Court's rationale for allowing a five-percent deviation in population for state legislative apportionment is to enable states to maintain political subdivisions, such as counties, yet the redistricting plan at issue here deviates substantially from the "nearly as equal . . . as may be" population requirement of Art. IX, § 200, for each senate district, while it carves up nearly half of the counties in the State. For the defendants to justify the plan's substantial deviations in population by pointing to the percentage deviations permitted by federal courts and then to ignore the very reason those courts permit those deviations defies logic.
The few federal district court cases referenced earlier that have examined the *Page 173 
constitutionality of legislative apportionment schemes under Art. IX, § 200, bear out the importance of the interplay between the percentage deviation in population provided under the scheme and the number of counties split by the scheme. Sims v. Amos, 336 F. Supp. 924
(M.D.Ala. 1972), Burton v. Hobbie, 543 F. Supp. 235 (M.D.Ala. 1982), and Burton v. Hobbie, 561 F. Supp. 1029 (M.D.Ala. 1983), all examine both the percentage of deviations in population between districts and the number of split counties created by the redistricting when evaluating the constitutionality of a State legislative apportionment scheme under the Alabama Constitution. There is no reason why we should not do the same, given the mandate of Art. IX, § 200.
When all of the facts and arguments are considered, it would appear that Act No. 2001-727 probably violates Art. IX, § 200, but that conclusion is not even necessary for a reversal here. All that is required is that the Rice plaintiffs have created a genuine issue of material fact. Given the lack of evidence presented by the defendants to carry their initial burden, the lack of precedent on this issue, the substantial deviations in population permitted by the plan, the number of counties split by the plan in direct contravention to both Art. IX, § 200, and the reapportionment committee guidelines, the trial court's failure to consider arguments and affidavits I believe it should have considered, and the logical contradiction in the defendants' argument, a genuine issue of material fact clearly exists in this case.
The majority of this Court discusses the propriety of judicial review and the Court's need to practice restraint in exercising that power. However, our power and scope of judicial review is not in issue here, where, as the majority recognizes, we would abdicate our responsibility if we allow the Legislature to conduct "itself in a manner inconsistent with [our] constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution." So.2d at .
The Court is necessarily exercising judicial review in this case, because it reviews the constitutionality of Act No. 2001-727; the outcome of that review does not determine whether we are exercising that power. If the Court believes that it does not have the power to review this issue because it presents a purely legislative matter, then it should so state and refrain. But a determination that the Rice plaintiffs have not overcome the presumption of constitutionality is, in essence, an exercise of judicial review. An argument that judicial review precludes a review of a summary judgment on such an important constitutional issue is, in actuality, an avoidance of our constitutional responsibility.
Representation is the bedrock tool of our democratic republican government. "[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." Reynolds v. Sims, 377 U.S. 533, 565 (1964). It means just as much, if not more, where state legislative bodies are concerned as it does for Congress, because "[s]tate legislatures are, historically, the fountainhead of representative government in this country." Reynolds,377 U.S. at 564. Pretermitting argument on the legislative reapportionment scheme when possible constitutional violations are at stake is unconscionable. Further consideration of the issues is warranted; thus, summary judgment should not have been granted. Accordingly, I dissent. *Page 174