In this action for damages based on the alleged wrongful death of Robert Lee Bibby, the trial court granted the motion for summary judgment filed by Dr. Perry Timberlake, one of several named defendants. The trial court also expressly ordered that the judgment in favor of Dr. Timberlake be "final," pursuant to Rule 54(b), A.R.Civ.P. The plaintiff, William R. Murray, administrator of Bibby's estate, brings this appeal from the judgment in favor of Dr. Timberlake. We affirm.
Robert Lee Bibby began serving a 15-year prison sentence in September 1985 in a state correctional facility. During most of the first 10 months of his incarceration, Bibby was held in a state correctional system medical facility for treatment of medical complaints, especially for recurring chest pains. During the summer of 1986, Bibby was transferred to the Hale County jail in Greensboro, to serve his prison term in an area closer to his parents and his six-year-old daughter.
While in the Hale County jail, Bibby complained of chest pains. On July 31, 1986, a Hale County deputy sheriff took Bibby to Dr. Perry Timberlake, a private physician in Greensboro.[1] When Timberlake saw Bibby, neither Bibby nor the sheriff indicated that Bibby was "in distress" or in pain, and Bibby was not given medication for pain. Timberlake ascertained from Bibby's answers to questions asked by his office personnel that Bibby suffered from chronic asthma and that he had a history of heavy cigarette smoking.
As a result of his own examination of Bibby and of Bibby's description of his own symptoms (shortness of breath and wheezing for the past five days), Timberlake treated Bibby for "moderate asthmatic bronchitis" with an injection of epinephrine. Timberlake kept Bibby under observation until the medication relieved Bibby's symptoms and then Timberlake told Bibby, in the presence of the deputy sheriff, that, if Bibby's symptoms returned or became more severe, Bibby should contact him or have someone at the jail contact him. Timberlake also prescribed two medicines for Bibby to take after returning to jail.
Two days later, Bibby experienced chest pains and cut short a visit with his parents and daughter. Despite Bibby's request to the sheriff, he was not taken to a doctor, but was returned to his cell. Approximately 15 minutes later, Bibby suffered a full cardiac and pulmonary arrest as a result of an undiagnosed occlusion of the left descending coronary artery and died.
Bibby's lawyer, William R. Murray, was appointed administrator of his estate and, in that capacity, he filed the instant lawsuit on August 1, 1988, the day before the expiration of the limitations period for filing the action. See Ala. Code 1975, § 6-2-38.
The complaint, alleging wrongful death and a violation of the 8th Amendment to the United States Constitution and claiming relief under 42 U.S.C. § 1983, named the following defendants: 1) Correctional Medical Systems of Alabama, Inc. ("CMSOA"), a corporation that, at the time Bibby was a prisoner, operated the state correctional medical facilities under a contract with the *Page 887 
State of Alabama; 2) Dr. Roy Johnson, medical director of CMSOA; 3) Dr. James L. Guest, an employee of CMSOA who personally treated Bibby at the correctional medical facility; 4) Dr. Timberlake; 5) Sheriff Chester Colvin of Hale County; and 6) the Board of Commissioners of Hale County.
On April 24, 1989, Dr. Timberlake and Dr. Johnson filed motions for summary judgment, with their respective supporting affidavits. On May 15, 1989, after the attorneys for the parties had received copies of the trial court's "Civil Pre-Trial Bar Docket" for May 29, 1989, Timberlake's lawyer informed Murray that he would request a hearing on the pending motions during the pre-trial docket on May 19.
Murray responded by 1) writing to the clerk of the trial court and requesting that a "records subpoena" be issued to CMSOA; 2) filing a motion to delay the trial court's ruling on the motions for summary judgment until he obtained Bibby's full medical records; and 3) writing to Timberlake's lawyer, stating that he would seek a delay of the May 29 hearing, because of his lack of Bibby's complete medical records. However, in the letter to Timberlake's lawyer, Murray also stated that the problem of the lack of complete medical records "does not exist, of course, with respect to your client, Dr. Timberlake."
The trial court granted a continuance of the hearing on the defendants' motions for summary judgment and reset the hearing for August 2, 1989; however, the trial court advised the parties that there would be no further delays or continuances and that the defendants' motions for summary judgment would be ruled on on August 2. The trial court further advised Murray that he should "move expeditiously" to obtain whatever additional medical records he needed.
On July 14, 1989, at Murray's request, the clerk's office issued a "records subpoena" to St. Margaret's Hospital in Montgomery, Alabama. Bibby's records from the hospital were received in the clerk's office on July 31, 1989.
Despite the trial court's earlier admonition, Murray sought a continuance of the hearing scheduled for August 2. Murray contends that, approximately one week before the August 2 hearing, he and his expert witness, Dr. Arthur Pedersen of Cheraw, South Carolina, discovered "serious discrepancies" between the two sets of medical records supplied by defendant CMSOA. Murray further claims, as he did in the hearing on August 2, 1989, that the discrepancies between the two sets of medical records could not be understood or reconciled without in-person discussions between Murray and Pedersen.
When Murray advised Timberlake's lawyer of his intention to seek a further continuance, Timberlake's lawyer reminded Murray of the trial court's previous decision not to allow further delays and to rule on the pending motions (which, by now, included motions for summary judgment filed by CMSOA and Dr. Johnson) at the August 2 hearing. The continuance was not granted.[2] Murray, however, drove to South Carolina, worked on the medical records with Pedersen, and returned to Alabama on July 31, 1989, with Dr. Pedersen's affidavit (dated July 29, 1989) in support of Murray's opposition to the defendants' motions for summary judgment.
On August 2, 1989, just prior to the scheduled hearing, Murray filed with the clerk's office and served on counsel for the parties a packet of materials containing medical records, four motions, and Dr. Pedersen's affidavit. Thereupon, Timberlake's lawyer filed a motion asking the trial court to strike the Pedersen affidavit as to Timberlake or to disregard the affidavit and refuse to consider it in relation to Timberlake's motion for summary judgment. As grounds for his motion, Timberlake's lawyer pointed out 1) that the affidavit had been filed and served on the day of the hearing, in direct contravention of Rules 6(d) and 56(c), A.R.Civ.P.; 2) that the Pedersen *Page 888 
affidavit was not properly verified or sworn to; and 3) that portions of the affidavit relating to Timberlake were inadmissible hearsay because they were based on attached medical records that were not certified or verified.
On August 11, 1989, the trial court issued a written order that: 1) dismissed defendant Dr. Guest with prejudice, on the motion of the plaintiff; 2) held that the Pedersen affidavit had been filed in contravention of Rules 6(d) and 56(c), that it was not properly sworn to or verified, and that the affidavit's statements regarding Timberlake were based on hearsay, and, therefore, granted Timberlake's motion to strike Pedersen's affidavit; 3) held that, under the circumstances of the case, the trial court would not exercise its discretion in favor of Murray so as to allow the untimely filings; 4) granted defendant Timberlake's motion for summary judgment and certified the resulting judgment as final; 5) denied the summary judgment motions of defendants CMSOA and Johnson; and 6) granted Murray's motion to substitute a named party for fictitious party "A." This appeal attacks that portion entering a final summary judgment for Timberlake.
Murray first argues that Timberlake's treatment of Bibby places this case within an exception to the general rule in medical malpractice cases that "[t]o establish a physician's negligence, the plaintiff must ordinarily proffer expert medical testimony as to what is or is not the proper practice, treatment or procedure." Holt v. Godsil, 447 So.2d 191, 192
(Ala. 1984). See, also, Dobbs v. Smith, 514 So.2d 871 (Ala. 1987). Murray contends that Timberlake's treatment of Bibby amounts to misconduct that is apparent to a layman and that can be comprehended through common knowledge and understanding without the assistance of expert testimony. Powell v. Mullins,479 So.2d 1119 (Ala. 1985); and Parrish v. Spink, 284 Ala. 263,224 So.2d 621 (1969). See, also, Swendsen v. Gross,530 So.2d 764 (Ala. 1988); and Therrell v. Fonde, 495 So.2d 1046 (Ala. 1986). We disagree.
In his affidavit in support of his motion for summary judgment, Timberlake described in detail his examination and treatment of Bibby on the one occasion when Bibby was brought to Timberlake's office. The affidavit reads, in part:
 "There was no information given by Mr. Bibby or Mr. Tooson [the deputy sheriff], or any other indication otherwise, that Mr. Bibby was in any sort of real distress when he came in or had been at any time while he was waiting in my waiting room to be seen. He had no complaints of pain and was not given anything for pain. His complaint was of shortness of breath and 'wheezing' for the past five days. He gave a history of heavy smoking. He had been experiencing a nonproductive cough. One of my office staff had taken preliminary information from him, and had recorded on our office chart that Mr. Bibby was complaining of 'chest pain and asthma.' When I inquired about his chest pain, he described it in such a way as to reveal that it was minimal or nonexistent at that time, and had been minimal over the last few days. In listening to his chest with my stethoscope, I perceived loose wheezing throughout. Mr. Bibby had a dry cough. My diagnosis was of moderate asthmatic bronchitis. I gave him a shot of Epinephrine for that and waited to see if it helped. It did. I also prescribed Aminophylline for him to take and Erythromycin in the form of 250 mg. tablets to be taken four times a day for seven days. Mr. Bibby's recorded pulse rate was 72, which is certainly not the heart rate of someone in significant pain. His blood pressure was 120/70. Mr. Bibby was advised, in the presence of Mr. Tooson, to let me know if his wheezing didn't get better."
Based on Bibby's history and symptoms, related to Timberlake by Bibby himself, Timberlake made a diagnosis consistent with the history and symptoms and treated Bibby in accordance with that diagnosis. Whether Timberlake should have diagnosed Bibby's other medical condition based on the same information is not a conclusion to be made without expert medical *Page 889 
guidance. Clearly, the resolution of such a question does not fall within the "layman's common knowledge and understanding" exception to the general rule requiring expert testimony in medical malpractice cases; therefore, to rebut Timberlake's affidavit, Murray was required to file the affidavit of a medical expert in support of his opposition to Timberlake's motion for summary judgment.
Having held that expert testimony was required to rebut Timberlake's affidavit, we turn to Murray's contention that the trial court erred in rejecting the proffered affidavit of Murray's expert, Dr. Pedersen.
Murray concedes that he filed and served his 48-page response to the pending summary judgment motions (including the supporting affidavit of Dr. Pedersen) approximately 2 1/2 hours before the hearing on the motions was to begin. Murray claims, however, that such a procedure is authorized by "an amalgamation of A.R.Civ.P. Rules 1, 5(b), 6(d), and 56(c)," and that, under the totality of the circumstances, the trial court abused its discretion and erred in rejecting Murray's response and supporting affidavit as untimely filed. We disagree.
Murray relies on Nolen v. Peterson, 544 So.2d 863 (Ala. 1989), in which this Court held that the trial court had abused its discretion in rejecting the plaintiff's counter-affidavits filed on the day of the hearing on the pending motion for summary judgment. It is important to note, however, the specific language of the Nolen opinion upon which Murray rests his argument:
 "The defendants rely heavily upon our case of Johnson v. Allstate Ins. Co., 505 So.2d 362 (Ala. 1987), and the Fifth Circuit Court of Appeals case of Farina v. Mission Inv. Trust, 615 F.2d 1068 (5th Cir. 1980), for the proposition that the trial court's exercise of discretion in disallowing untimely filed Rule 56(c) affidavits will be reversed only for abuse of discretion. We agree that this is the appropriate standard of review. Our review, pursuant to that standard, however, is influenced by the spirit of Rule 1's admonition in favor of an adjudication on the merits of every case. Just as in the case of a default judgment pursuant to Rule 55, a discretionary summary judgment that ends the litigation in favor of the defendant, because of the plaintiff's failure of strict compliance with Rule 56(c), must be reviewed in light of the totality of the circumstances of each case."
Nolen, 544 So.2d at 865-66. (Emphasis in original.)
In Nolen, we held that the totality of the circumstances did not justify the trial court's refusal to accept the proffered affidavit. Indeed, Nolen's third lawyer found himself in the position of having only "one full day between his employment and the date of the hearing" (Nolen, 544 So.2d at 866), thus making the filing of the counter-affidavit on the date of the hearing a "timely filing" under the totality of the circumstances.
The facts of the instant case, however, convince us that the trial court was correct and did not abuse its discretion in disallowing the materials filed and served by Murray on the day of the hearing on the pending motions for summary judgment. Murray had already sought and obtained a two-month continuance after the first date set for a hearing on Timberlake's motion for summary judgment, for reasons similar to those advanced by Murray in support of his current argument for reversal: the lack of complete medical records on Bibby. It is interesting to note, however, that in the letter to Timberlake's lawyer advising him of Murray's intention to seek the first continuance, Murray stated that the problem of Bibby's incomplete medical records "does not exist, of course, with respect to your client, Dr. Timberlake."
Further, in granting the first continuance, the trial court warned Murray to "move expeditiously" to secure the needed medical records, and went on to put the parties "on notice" of its intention that no more delays or continuances would be granted. Therefore, Murray advised Timberlake's lawyer of his intention to seek a further continuance of the August 2 hearing, *Page 890 
and then asked for the delay, with full awareness of the trial court's earlier warning against such a request. Too, with the knowledge that his request for a continuance had been denied and that the hearing would take place on August 2, Murray left the state to travel to South Carolina to confer with Dr. Pedersen, returning to Tuscaloosa two days before the hearing.
"In the absence of a showing of excusable neglect, the trial court does not abuse its discretion when it refuses to accept out-of-time affidavits." Johnson v. Allstate Ins. Co.,505 So.2d 362, 364 (Ala. 1987). The totality of the circumstances here reveals no "excusable neglect," and we hold that the trial court did not abuse its discretion in refusing to accept the untimely filed affidavit of Dr. Pedersen.
Murray next contends that the trial court erred in ruling on Timberlake's motion for summary judgment before Murray had completed his discovery of Bibby's medical records. We find no merit in this argument. There was no pending request for the production of documentary evidence from Timberlake at the time of the hearing and the entry of summary judgment. Despite Murray's supposition in his brief to this Court that medical records from Timberlake's office could have become commingled with CMSOA records, there was no evidence before the trial court, and there is none in the record before us, to support such a theory. Indeed, as noted earlier, in a letter to Timberlake's lawyer, Murray stated that Bibby's incomplete medical records did not affect Timberlake as a party to this action. In view of these circumstances, in addition to the fact that the hearing had already been delayed once because of Murray's failure to complete discovery, we find no error in the trial court's ruling on Timberlake's motion for summary judgment prior to Murray's completion of discovery in the case. See Reeves v. Porter, 521 So.2d 963 (Ala. 1988).
Murray's fourth argument is that the trial court erred in rejecting the Pedersen affidavit as being improperly sworn to or verified. This claim has been mooted by our holding that the Pedersen affidavit was properly disregarded by the trial court as being untimely filed. We note, however, that Murray's argument with respect to the verification of the affidavit is without merit.
Ala. Code 1975, § 12-21-4, sets out the requirements for obtaining an out-of-state affidavit that will be used in an action in an Alabama court:
 "Affidavits required in the commencement or progress of any action or judicial proceedings may be taken without this state before any commissioner appointed by the governor of this state, any judge or clerk of a federal court, any judge or clerk of any court of record, or any notary public, who shall certify under their hands and seals of office, if any."
The South Carolina notary public who signed the certification portion of Pedersen's affidavit failed to affix the seal of her office and, therefore, did not comply with the statutory requisites of § 12-21-4. This noncompliance with the statute's mandatory directive, couched in plain language that requires no special interpretation, would most certainly have rendered the affidavit void if it had been timely filed. See, e.g., CoastalStates Gas Transmission Co. v. Alabama Public Service Comm'n,524 So.2d 357 (Ala. 1988); and Mobile County Republican Exec.Comm. v. Mandeville, 363 So.2d 754 (Ala. 1978).
Despite Murray's vigorous argument to the contrary, his fifth argument on appeal is similarly without merit (this argument, too, is mooted by our holding that Murray's response to the summary judgment motions and supporting affidavit were untimely filed). The record does not contain evidence to support Murray's contention that the Pedersen affidavit was based upon certified copies of all of the papers and documents to which Pedersen refers. The record reflects that this requirement of Rule 56(e), A.R.Civ.P., was not complied with and that the Pedersen affidavit was deficient in this regard.
Murray's sixth argument on appeal attacks the trial court's adoption of an order drafted by Timberlake's lawyer, Robert B. Harwood, Jr. Murray makes the general *Page 891 
allegation that the order contains "a substantial number of distortions and untruths," but does not support this allegation with any specific instances of untruths or distortions. This argument is without merit.
Murray's final argument — that the trial judge should have recused himself from this case because he had represented Bibby in a previous legal matter — was never argued until Murray filed his brief with this Court. Murray's failure to object to the judge's participation in the case constitutes a waiver of that objection, and this Court can not address arguments seeking reversal that were not raised in the trial court. SeeRoss v. Luton, 456 So.2d 249 (Ala. 1984).
Therefore, we hold that the trial court properly entered the summary judgment for defendant Dr. Perry Timberlake. That judgment, therefore, is affirmed.
AFFIRMED.
HORNSBY, C.J., and SHORES, HOUSTON and KENNEDY, JJ., concur.
[1] Although Dr. Timberlake was not told why Bibby was brought to him for treatment, in his affidavit in support of his motion for summary judgment he states that the day on which he saw Bibby was a Thursday and that the local physician who normally sees and treats Hale County jail prisoners normally closed his office every Thursday afternoon.
[2] Although the trial court's case action summary sheet shows a continuance as having been granted on July 25, 1989, apparently the granting of the continuance was conditioned upon the consent of all other parties to the action, which consent was not given.