835 So.2d 157 (2002)
John W. RICE et al.
v.
Bill ENGLISH et al.
1010968.
Supreme Court of Alabama.
May 24, 2002.
*158 Mark G. Montiel, Montgomery, for appellants.
Bill Pryor, atty. gen., and John J. Park, asst. atty. gen., for appellees Bill English, Gloria Sinclair, Albert O. Howard, Alfonza Menefee, Johnny H. Williamson, Nancy O. Robertson, Lamar Turner, Jimmy Stubbs, Reese McKinney, Jr., Alfred Q. Booth, John E. Hulett, J. MacDonald Russell, Dwight Faulk, William C. Stone, and James Bennett.
James E. Williams, Flynn Mozingo, and C. Mark Bain of Melton, Espy & Williams, P.C., Montgomery; and Larry T. Menefee,
*159 Montgomery, for Governor Don Siegelman.
Robert D. Segall and Shannon L. Holliday of Copeland, Franco, Screws & Gill, P.A., Montgomery, for Senator Henry Sanders and Senator Lowell Barron.
LYONS, Justice.
This case involves a state-law challenge to the new redistricting plan for Alabama senate districts. That plan, proposed by Act No. 2001-727, 2001 Ala. Acts (hereinafter "the redistricting plan"), was approved by Governor Don Siegelman on July 3, 2001, and was precleared by the Attorney General of the United States on October 15, 2001. John W. Rice, William McCall Harris, and Patricia Christine N. Wood (hereinafter collectively referred to as "the Rice plaintiffs") challenged the redistricting plan, naming as defendants state election officials and contending that the plan failed to satisfy the one-person, one-vote standard they viewed as mandated by Art. IX, § 200, Ala. Const.1901. The Montgomery Circuit Court entered a summary judgment in favor of the state election officials. This appeal followed.

I. Constitutional Background
Art. IX, § 200, Ala. Const.1901, describes the duty of the Legislature in the creation of senate districts. It provides:
"It shall be the duty of the legislature at its first session after taking of the decennial census of the United States in the year nineteen hundred and ten, and after each subsequent decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators, which districts shall be as nearly equal to each other in the number of inhabitants as may be, and each shall be entitled to one senator, and no more; and such districts, when formed, shall not be changed until the next apportioning session of the legislature, after the next decennial census of the United States shall have been taken; provided, that counties created after the next preceding apportioning session of the legislature may be attached to senatorial districts. No county shall be divided between two districts, and no district shall be made up of two or more counties not contiguous to each other."

(Emphasis added.)
Section 200 prohibits a districting plan that divides a county between two districts. In other words, county lines must be preserved in any redistricting plan. To accommodate the obvious fact that only a remarkably fortuitous circumstance would permit absolute equality in population between districts while observing the integrity of county lines § 200 speaks in practical terms of the goal that the population of the districts be equal. It requires the districts to be "as nearly equal to each other in the number of inhabitants as may be."
In earlier litigation challenging the constitutionality of Alabama legislative districts on the basis of population disparity under the "one-man, one-vote" requirement as expressed in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court discussed the necessity of harmonizing the requirement of § 200 for integrity of county lines with the requirement for substantial equality of population in legislative districts. Of course, pursuant to the Supremacy Clause in Art. VI of the United States Constitution, any provisions of § 200 that conflict with the Fourteenth Amendment to the United States Constitution would not be enforceable. Such a result was reached in Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.), aff'd, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972), in which the three-judge panel held:

*160 "In approving the crossing of county lines, we necessarily fail to give effect to that part of Art. IX, § 200, Alabama Constitution of 1901, which forbids splitting any county between two or more legislative districts. We find that the requirements of equal protection necessitate, in some instances, that county lines give way in drawing legislative districts. To the extent that Section 200 forbids such, it must yield for `when there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.'"
336 F.Supp. at 939 n. 20 (quoting Reynolds v. Sims, 377 U.S. at 584, 84 S.Ct. 1362).

II. Procedural History
On August 9, 2001, the Rice plaintiffs filed their complaint in the Montgomery Circuit Court, seeking declaratory and injunctive relief. The Rice plaintiffs named Bill English, probate judge of Lee County, and 13 other probate judges, as well as Secretary of State James Bennett, each in his or her official capacity, as defendants (hereinafter collectively referred to as "the election officials"). The Rice plaintiffs contended that the new senate districts failed to satisfy Art. I, § 33,[1] and Art. IX, § 200, Ala. Const.1901, in that the population of the new districts was not "as nearly equal to each other ... as may be." Art. IX, § 200. The Rice plaintiffs sought a judgment declaring that the new plan violates state law and injunctive relief that would, among other things, prohibit the use of the new districts in any election.
The election officials answered the complaint and moved to stay further proceedings pending preclearance of the plan by federal officials. When the State received a letter from the United States Department of Justice stating that the Attorney General of the United States interposed no objection to the plan, the State advised the trial court that the plan had been precleared by filing a copy of the letter with the court.
While preclearance of the redistricting plan was pending, Governor Siegelman moved to intervene as a defendant; the trial court granted his motion. After the State obtained preclearance, Senators Lowell Barron and Henry Sanders also moved to intervene as defendants. The trial court granted that motion on January 10, 2002.
On November 19, 2001, the trial court entered a scheduling order, pursuant to which the parties were to file any dispositive motions by December 19, 2001, and were to argue those motions at a hearing to be held on January 10, 2002. On December 19, 2001, Secretary of State Bennett, for himself and the other election officials, filed a motion for a summary judgment, together with a supporting brief and a narrative summary of the undisputed material facts. Governor Siegelman joined in the election officials' motion. Even though their motion to intervene had not been ruled on, Senators Barron and Sanders, on December 19, 2001, also moved for a summary judgment in their favor. On January 10, 2002, the trial court heard oral argument on the election officials' summary-judgment motion. At the time of the hearing, the Rice plaintiffs had not filed any written response to any of the summary-judgment motions. They did not file any response until January 17, 2002, when they filed what they entitled "Rice Plaintiffs' Response and Objection to *161 Motions for Summary Judgment by Other Parties; or, Alternatively, Response and Opposition to Motion by Intervenors Barron and Sanders for Summary Judgment."
On January 28, 2002, the trial court entered two orders. In the first order, it held that the state-law claims before it were justiciable. In the second, it (1) granted the election officials' motion for a summary judgment, in which it noted that Senators Barron and Sanders had orally joined in the motion to the extent that it addressed the merits of the Rice plaintiffs' claims (as opposed to the justiciability of those claims); (2) stated that the summary-judgment motion filed by Senators Barron and Sanders was not before the court on January 9, 2002, and would not be considered; and (3) held that the Rice plaintiffs' response was not timely filed and would not be considered. On February 11, 2002, the Rice plaintiffs filed a notice of appeal.
The trial court's findings in its summary-judgment order can be summarized as follows:
(1) In adopting Art. IX, § 200, the drafters of the Alabama Constitution of 1901 did not require senate districts to be absolutely equal in population and, in fact, endorsed overall population deviations in excess of 202% for senate districts;
(2) Apportionment is primarily a legislative function; courts should act only if the Legislature fails to act constitutionally after having had a reasonable opportunity to do so. Brooks v. Bobbie, 631 So.2d 883, 890 (Ala.1993);
(3) The Legislature has itself adopted a 10% variance rule in its guidelines for reapportionment;
(4) Other states also apply a 10% variance rule;
(5) A federal district court in Alabama has already ruled that § 200 does not require greater equality in population in legislative districts than does federal law, and federal law generally permits deviations not exceeding 10%. Sims v. Amos, supra; and
(6) The plain meaning of § 200 itself does not require absolute population equality; instead, it requires the districts to be "as nearly equal as ... may be."

III. Jurisdiction
The election officials argue that the separation-of-powers doctrine enshrined in § 43, Ala. Const.1901, requires that this Court decline jurisdiction over this case. The election officials remind us that in earlier cases this Court has refused to recognize the justiciability of redistricting claims, citing Waid v. Pool, 255 Ala. 441, 51 So.2d 869 (1951), and Ex parte Rice, 273 Ala. 712, 143 So.2d 848 (1962). The election officials attempt to distinguish Brooks v. Hobbie, supra, in which, they argue, this Court recognized the justiciability of redistricting claims only in those cases where the Legislature has wholly failed to act. The election officials support their contention with a quote from an opinion of the Supreme Court of Tennessee, quoted in Brooks v. Hobbie, observing that "`courts should act only if the legislature fails to act constitutionally after having had a reasonable opportunity to do so.'" 631 So.2d at 888 (quoting Lockert v. Crowell, 631 S.W.2d 702, 706 (Tenn.1982)). However, the quoted text from Lockert refers to the failure to act "constitutionally"not a failure to act at all. Id. We decline to read this Court's statement in Brooks v. Hobbie that "in the event the legislature fails to act, the responsibility shifts to the state judiciary" as limiting this Court's jurisdiction to only those instances in which the Legislature has failed to act at all. Brooks, 631 So.2d at 890.
*162 In Brooks v. Hobbie, this Court distinguished Waid and Rice, noting that the Court's disinclination to act in the earlier cases was based upon a judicially imposed prudential limitation on the Court's authority in sensitive areas involving redistricting, rather than upon any provision of the State constitution limiting the power of courts to entertain the action. Brooks, 631 So.2d at 885. The election officials dismiss this basis for distinction as unconvincing; they suggest that "there is considerable tension between Brooks and Waid v. Pool."We decline this veiled invitation to overrule Brooks v. Hobbie, mindful of the necessity for great deference to be given to legislative enactments when those enactments are challenged on constitutional grounds, as we discuss more fully below.[2]
Justice Houston's special concurrence states that Brooks v. Hobbie confused this Court's responsibility under federal law with "our responsibility under State law, where our jurisdiction is restricted by the separation-of-powers provision in the Alabama Constitution." 835 So.2d at 168 n. 4. It then concludes that "it is for the Legislature, not the judiciary, to determine whether these senatorial districts are as `nearly equal to each other in the number of inhabitants as may be,'" citing Art. III, § 43, Ala. Const.1901 (the separation-of-powers clause). Id. Such abdication of judicial responsibility is inconsistent with the settled principle that the people have forbidden the Legislature from conducting itself in a manner inconsistent with their constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution. See Ex parte Selma & Gulf R.R., 45 Ala. 696 (1871).
However, in Ex parte Selma & Gulf R.R., this Court, while recognizing the Court's power to exercise judicial review of acts of the Legislature, was also mindful of the need for restraint. This Court there stated:
"No power of this grave nature [i.e., judicial review of legislative acts] is expressly given. Considering its importance, it is a little strange that it has been wholly omitted. But, grant that it exists. It can not be permitted to rest upon mere inference and argument; because, if the inference is a mistake, or the argument is false, its exercise is an usurpation by one branch of the government against the authority of another. Did the people mean to grant such a power, unless some express clause of the constitution was clearly disregarded? I think not."

45 Ala. at 728 (emphasis added).
This discussion of the doctrine of judicial review is remarkably parallel to the observations of Judge Learned Hand, speaking of the United States Constitution, almost 80 years later. Judge Hand stated:
"There was nothing in the United States Constitution that gave courts any authority to review the decisions of Congress; and it was a plausibleindeed to my mind an unanswerableargument that it invaded the `Separation of Powers' which, as so many then believed, was the condition of all free government."
Learned Hand, The Bill of Rights: The Oliver Wendell Holmes Lectures, 1958, 10-11 (Harvard University Press 1958). However, Judge Hand justified the propriety of judicial review as follows:

*163 "For centuries it has been an accepted canon in interpretation of documents to interpolate into the text such provisions, though not expressed, as are essential to prevent the defeat of the venture at hand; and this applies with especial force to the interpretation of constitutions, which, since they are designed to cover a great multitude of necessarily unforeseen occasions, must be cast in general language, unless they are constantly amended. If so, it was altogether in keeping with established practice for the Supreme Court to assume an authority to keep the states, Congress, and the President within their prescribed powers. Otherwise the government could not proceed as planned; and indeed would almost certainly have foundered, as in fact it almost did over that very issue.
"However, since this power is not a logical deduction from the structure of the Constitution but only a practical condition upon its successful operation, it need not be exercised whenever a court sees, or thinks that is sees, an invasion of the Constitution."
Id. at 14-15 (emphasis added). Judge Hand later described the power of judicial review as "no doubt a dangerous liberty, not lightly to be resorted to...." Id. at 29.
When Ex parte Selma & Gulf R.R. was written, a separation-of-powers clause appeared in Article III of the Constitution of 1868. The same text had appeared in every version of the Constitution since statehood in 1819. Article III of the Constitution of 1868 was copied word-for-word into Article III of the Constitution of 1875. The text was slightly modified in Article III, § 43, of the Constitution of 1901. However, William C. Oates, a delegate to the Constitutional Convention of 1901, comparing the differences between the Constitution of 1875 and the Constitution of 1901, stated, "The distribution of powers of government is substantially the same as in the old or present [1875] Constitution." 4 Official Proceedings of the Constitutional Convention of 1901, p. 4948. We conclude that the authority of this Court to review challenges to acts of the Legislature on constitutional grounds is a bedrock principle of our State's legal heritage.

IV. Standard of Review
In Monroe v. Harco, Inc., 762 So.2d 828, 831 (Ala.2000), this Court restated the long-standing rules governing review of acts of the Legislature under constitutional attack:
"`In reviewing [a question regarding] the constitutionality of a statute, we "approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government."' Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 159 (Ala.1991) (quoting Alabama State Fed'n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944)). Moreover, `[w]here the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction [that] would uphold it.' McAdory, 246 Ala. at 10, 18 So.2d at 815. In McAdory, this Court further stated:
"`[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear *164 beyond reasonable doubt that it is violative of the fundamental law.'
"246 Ala. at 9, 18 So.2d at 815 (citation omitted). We must afford the Legislature the highest degree of deference, and construe its acts as constitutional if their language so permits. Id."

V. Analysis
By the redistricting plan, the Legislature established 35 senate districts for the State. The Senate, according to the redistricting plan, is to be composed of 35 members, each representing a district whose total population is within plus or minus five percent of the ideal population of a senate district. In creating those districts, the Legislature split 30 of the State's 67 counties. While the Rice plaintiffs rely on § 200, they concede, as they must, that, notwithstanding the clear prohibition of § 200, disregard of county lines is necessary to accommodate enforcement of the United States Constitution.
The Rice plaintiffs base a significant portion of their appellate argument on the contention that splitting counties must be held to the absolute minimum and that the Legislature's attempt in the redistricting plan to satisfy the requirements of population equality at the expense of preserving county lines exceeds the absolute minimum. The trial court's order conspicuously fails to address this contention; however, that omission is not an oversight.
The Rice plaintiffs contended in the trial court that the redistricting act violated § 200 in that the act disregarded the requirement of the Alabama Constitution that senate districts must have equal populations. The Rice plaintiffs' complaint stated:
"32. [I]n order to achieve required population equality among Alabama's thirty-five (35) state senate districts, as proscribed by Ala. Const. art. IX, § 200, the population of each state Senate district should be 127,060 persons with each senate district `as nearly equal to each other in the number of inhabitants as may be.' See Ala. Const. art. IX, § 200.
"33. Pursuant to Act No. 2001-727, Alabama's most populous state senate district, Senate District 8, has 133,302 persons. Accordingly, Senate District 8 exceeds the constitutionally required population by 6,242 persons, or 4.91%. Alabama's least populous state senate district, Senate District 6, has 120,942 persons. Accordingly, Senate District 6 falls short of the constitutionally required population by 6,118 persons, or 4.82%. The difference between the populations of the most populous and the least populous state senate districts in Act No. 2001-727 is 12,360 persons, which constitutes a `relative overall range' of 9.73%."
(Footnotes omitted.) Nowhere in the complaint do the Rice plaintiffs challenge the degree to which county lines were disregarded. Likewise, in the summary-judgment hearing held by the trial court on January 10, 2002, the Rice plaintiffs argued:
"MR. MONTIEL [counsel for the Rice plaintiffs]: The first argument that the State makes, which is joined apparently by intervenors Barron and Sanders, is that Section 200 does not mean what we contend it is; that is, that the districts be as nearly as equal in the inhabitants as may be.
"....
"Article 1, Section 2 [of the United States Constitution] deals with congressional districts. Federal courts are crystal clear, and the caselaw is undisputed in this country. The congressional districts, because of that language in *165 the Federal Constitution, have to be drawn as nearly as equal, and I will submit to Your Honor that most states draw on to zero deviation; i.e., equal population.
"THE COURT: But not all of them?
"MR. MONTIEL: Occasionally a very, very small, de minimis, and the courts have said that these ranges, this, plus or minus 5 percent wouldn't be de minimis. There's no caseit's going to be like .017 percent, very small. It's where they may not be splitting a precinct and leave a few hundred people in the district. Might be constitutional or permissible under Article 1, Section 2 for the Constitution in congressional districts.
"THE COURT: The drafters of this 1901 provision, if they wanted equal, all they had to say was equaldraw them equal. Why would they modify that by saying nearly equal?
"MR. MONTIEL: Well, I think at that timeand I think that's why the court has to look at the development of technology. They wrote, `shall be'it's mandatory'shall be as nearly equal to each other in number of inhabitants as may be.' And we believe that requires the court to analyze whether or not the State of Alabama
"THE COURT: If I were drafting this statute and I wantedand my intention was for the districts to be equal, I would have written, `they shall be equal.'
"MR. MONTIEL: And we submit that's what it says.... It says `shall be as nearly as equal.' And as nearly as equal in inhabitants as may be in 2001 is zero deviation. And for purposes of the record, every district should have an equal number of inhabitants.
"....
"THE COURT: Doesn't [the phrase `as may be'] allow for some movement there, someI mean, doesn't it conjure up the notion that somebody realized that these things couldn't be mathematically certain?
"MR. MONTIEL: Judge, ... the answer to that is, if you are not splitting counties
"THE COURT: Uh-huh.
"MR. MONTIEL: And that's another part of Section 200 you're going to read.... You cannot use splitting counties as an excuse to violate equal population requirements under federal law. That's what the federal courts have determined in Reynolds v. Sims [377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ]. And what the federal court did in Reynolds v. Sims is [it] determined that certain provisions of Section 200 are unconstitutional, butand there's caselaw, plenty of caselaw at this point, Judge.... [The federal court] specifies that all provisions of Section 200 ... that don't violate federal law, should continue in existence, and certainly as-nearly-as-equal-in-inhabitants language doesn't violate federal law. I mean, that's saying if it's zero deviation, that violates no one."
The only reference to splitting counties in the argument before the trial court during the hearing on the summary-judgment motion occurs in the context of recognizing the ineffectiveness of that portion of § 200 condemning the splitting of counties when it stands in the way of the requirement of population equality in the legislative districts.
The Rice plaintiffs did not submit any written opposition to the summary-judgment motion, either before or at the hearing. At the conclusion of the hearing, the trial court gave the Rice plaintiffs permission to file additional materials *166 in response to the motion for a summary judgment filed by intervenors Senators Sanders and Barron, which was not before the court at the time of the hearing on the election officials' summary-judgment motion. One week after the hearing, the Rice plaintiffs submitted materials, including affidavits, which they styled as a response to the motion for summary judgment filed by the election officials or, alternatively, a response to the motion for summary judgment filed by intervenors Senators Sanders and Barron. In its order entered 11 days later, the trial court stated that it did not "reach the Motion for Summary Judgment filed by Defendant Intervenors Barron and Sanders." With respect to the Rice plaintiffs' response filed after the hearing, the trial court stated that it did not consider that response because it was untimely. Absent an abuse of discretion, a trial court does not err in striking as untimely affidavits in opposition to a motion for summary judgment. Murray v. Timberlake, 564 So.2d 885, 889 (Ala.1990); Nolen v. Peterson, 544 So.2d 863 (Ala.1989); Johnson v. Allstate Ins. Co., 505 So.2d 362 (Ala.1987). To the extent that this contention is raised in the response filed after the hearing on the election officials' motion for summary judgment, we hold that the trial court did not abuse its discretion in rejecting it as untimely. Indeed, the Rice plaintiffs do not contend otherwise, stating in their reply brief, "County splitting was not considered at all by the trial court, as admitted by each of the Appellees in their respective briefs." Reply Brief at pp. 2-3.
The Rice plaintiffs, therefore, contend for the first time on appeal that the redistricting act unnecessarily and excessively splits county lines in creating the State senate districts. Recently, in Porter v. Colonial Life & Accident Insurance Co., 828 So.2d 907, 908 (Ala.2002), we restated the long-standing general rule that "[t]he appellate courts will not consider a challenge to an order or a judgment of a trial court asserted for the first time on appeal." This Court has often applied that general rule in the specific context of attempts to overturn a trial court's summary judgment. See Ex parte Ryals, 773 So.2d 1011 (Ala.2000), where this Court stated, "[T]he appellate court can consider an argument against the validity of a summary judgment only to the extent that the record on appeal contains material from the trial court record presenting that argument to the trial court before or at the time of submission of the motion for summary judgment." 773 So.2d at 1013 (citing Andrews v. Mertitt Oil Co., 612 So.2d 409 (Ala.1992)) (second emphasis added). See also Ex parte Elba Gen. Hosp. & Nursing Home, Inc., 828 So.2d 308, 312 (Ala.2001), where this Court, after stating the general rule, observed:
"Put another way, on an appeal from a summary judgment, this Court cannot hold the trial court in error on the basis of arguments made for the first time on appeal. See Barnett v. Funding Plus of America, Inc., 740 So.2d 1069 (Ala.1999); West Town Plaza Assocs., Ltd. v. Wal-Mart Stores, Inc., 619 So.2d 1290 (Ala. 1993)."
The Rice plaintiffs seek to avoid this result by contending that § 200 requires, in addition to an evaluation of the population-equality requirement, an analysis of split counties. The Rice plaintiffs, however, cite no authority for setting aside the general rule requiring presentation of issues in the trial court as a predicate for appellate review in civil cases. The "plain-error" rule, which dispenses with the necessity for error preservation, is confined to death-penalty cases. The Rice plaintiffs' efforts to urge for the first time on appeal excessive disregard of county lines *167 in creating the senate districts as a basis upon which to reverse the trial court is therefore not before us.
The Rice plaintiffs also contend that the trial court erroneously applied the standard for equal protection under the Fourteenth Amendment to the United States Constitution, rather than the standard under § 200. We disagree. The trial court's references to standards derived in adherence to the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution are presented as illustrations or analogies and are not given the force of precedent. The trial court recognized the adoption of guidelines by the Legislature[3] that embrace an overall percentage deviation of 10 percent, with which the redistricting plan complies. The trial court also took account of relevant historical context when it cited facts indicating that the framers of the Alabama Constitution of 1901 had a remarkably high tolerance for deviations in population between senate districts. While it is true that the legislative districts created at the time of ratification of the Constitution of 1901 were not governed by § 200, which did not come into operation until the next decennial census, we construe constitutional and statutory provisions in light of the circumstances and conditions prevalent at the time of enactment.
"It is a familiar canon of statutory construction that `where there is doubt as to the meaning and intent of a statute by reason of the language employed, or arising from the context, courts may look to the history, conditions which lead to that enactment, the material surrounding circumstances, the ends to be accomplished, and evils to be avoided or corrected, in order that the legislative intent be ascertained and given effect, if possible.'"
Eagerton v. Graves, 252 Ala. 326, 331-32, 40 So.2d 417, 422 (1949) (quoting Henry v. McCormack Bros. Motor Car Co., 232 Ala. 196, 198, 167 So. 256, 257 (1936)). See also State Farm Fire & Cas. Co. v. Lambert, 291 Ala. 645, 648, 285 So.2d 917, 918 (1973) ("This question [of statutory construction] cannot be answered apart from the historical context within which the statute was passed."). The trial court did not inappropriately adhere to principles applicable only to proceedings governed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to the exclusion of principles of Alabama law applicable to the construction of § 200.
The Rice plaintiffs also contend that the trial court failed to consider "the obviously racially discriminatory pattern of population assignments" in the redistricting plan. Yet the Rice plaintiffs stated in the trial court, "[W]e don't make any allegations of race in this case."

VI. Conclusion
The trial court afforded the Legislature appropriate deference in its solution to the difficult question of dividing the State into 35 senate districts with approximately equal population. The districts created by the Legislature are within plus or minus five percent of the ideal population of a senate district. While various members of this Court, had we been privileged to participate in the legislative deliberations and then to cast votes according to our respective consciences, might have opted for different district boundaries, less disregard of county lines, or greater concern for more uniformity of *168 population within districts, we recognize that the people elected us to cast our votes as judges and not as legislators. As judges, we cannot overturn the redistricting plan on the grounds asserted by the Rice plaintiffs in the appeal before us. The Rice plaintiffs have failed to overcome the presumption of constitutionality that precedent requires us to attach to the redistricting plan. In so holding, we adhere to the admonition of this Court in Ex parte Selma & Gulf R.R. that we should refrain from exercising the power of judicial review, described as one of "grave nature," "unless some express clause of the constitution was clearly disregarded." 45 Ala. at 728 (emphasis added). We therefore decline to invoke what Judge Hand described as "no doubt a dangerous liberty, not lightly to be resorted to" (L. Hand, id. at 29) so as to require further proceedings on whether a deviation in population of plus or minus five percent violates the constitutional mandate of § 200 that "districts shall be as nearly equal to each other in the number of inhabitants as may be."
The trial court properly entered a summary judgment in favor of the election officials, as joined in by the intervenors; we affirm that judgment.
AFFIRMED.
BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON, J., concurs specially.
MOORE, C.J., and SEE, J., dissent.
HOUSTON, Justice (concurring specially).
The Legislature did its duty. ("It shall be the duty of the legislature ... after each ... decennial census, to fix by law the number of senators, and to divide the state into as many senatorial districts as there are senators...." Art. IX, § 200, Constitution of Alabama of 1901.) The Constitutional Convention of 1901 unequivocally defined what it meant when it provided in the Constitution that the Legislature shall do something. The Legislature is required to do the act the Constitution provides it shall do. "They [the Legislature] would violate their oaths if they did not do so." Official Proceedings of the Constitutional Convention of 1901, p. 1800.
The Legislature has done its constitutional duty; in doing so, it has in no way violated an express constitutional prohibition, such as encroaching on the rights retained in the Declaration of Rights of the Alabama Constitution (Art. I, §§ 1 through 36). There is no Equal Protection Clause in the Alabama Constitution. See Ex parte Melof, 553 So.2d 554 (Ala.1989). Under State law, which is all that is involved here,[4] it is for the Legislature, not the judiciary, to determine whether these senatorial districts are as "nearly equal to each other in the number of inhabitants as may be," because § 43 of the 1901 Constitution provides: "the judicial [department of government] shall never exercise the legislative or executive powers, or either of them; to the end that it may be a government of laws and not of men."
MOORE, Chief Justice (dissenting).
I strongly disagree with this Court's affirmance of the summary judgment in this important case.
The standard of review for a summary judgment is well-settled.

*169 "We review a summary judgment de novo.... A summary judgment is proper where `the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c)(3), Ala. R. Civ. P.... [A] party moving for a summary judgment always bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that it argues demonstrate the absence of a genuine issue of material fact."
Northwest Florida Truss, Inc. v. Baldwin County Commission, 782 So.2d 274, 276 (Ala.2000).
The defendants presented only three pieces of evidence to support their argument for a summary judgment: (1) the October 15, 2001, letter from the United States Department of Justice indicating that Act No. 2001-727, Ala. Acts 2001, had received preclearance under § 5 of the Voting Rights Act; (2) 1903 records of the State of Alabama Department of Archives and History, showing the population of Alabama counties from 1800 to 1900; and (3) an affidavit of Ms. Bonnie P. Shanholtzer, authenticating the reapportionment committee guidelines for the legislative, state board of education, and Congressional redistricting for the State of Alabama.
These submissions lack any relevance to the question before us in this case, which is whether Act No. 2001-727 violates Art. IX, § 200, Ala. Const. of 1901. Preclearance from the United States Justice Department demonstrates that the plan is probably constitutional under the Voting Rights Act of 1964 prohibiting racial discrimination, but here, where no racial discrimination is alleged, preclearance does not help us in evaluating the state constitutional claims under Art. IX, § 200.
The population records from 1903 were submitted ostensibly to demonstrate that the State permitted wide deviations in the populations of districts at the time of the adoption of Art. IX, § 200. However, population deviations before the effective date of the 1901 Constitution are simply irrelevant. First, the language of Art. IX, § 200 stipulates that that section is to be applied after each decennial census; thus, it first applied to redistricting in 1910. Second, in Reynolds v. Sims, 377 U.S. 533, 569, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the United States Supreme Court later confirmed the finding of a lower court that the Alabama Legislature had not adhered to federal or state constitutional guidelines regarding apportionment for over 60 years and ordered reapportionment according to its "one-man, one-vote" analysis. At the time Reynolds v. Sims was decided, the State had not reapportioned its districts since 1901; therefore, in 1903 the districts had never been apportioned "as nearly equal to each other in the number of inhabitants as may be," Art. IX, § 200. See Sims v. Frink, 208 F.Supp. 431, 435 (M.D.Ala.1962) (three-judge panel). Indeed, existing population deviations from 1903 until 1964 were the very reason the United States Supreme Court found Alabama's legislative scheme to be in violation of the "one-man, one-vote" rule propounded in Reynolds.
Nevertheless, the trial court cited the population deviation of districts at the time of the adoption of Art. IX, § 200, as its main evidence in support of its holding that Art. IX, § 200, does not require strict population equality among senate districts. Stated alternatively, the trial court used a population-deviation scheme that violated the federal constitution to demonstrate that the present scheme does not violate *170 the State constitution. This conclusion is clearly contrary to the rules of constitutional interpretation: A state "`may, in fact, provide more protection for private rights than the United States Constitution requires,'" but it cannot provide less. Brooks v. Hobbie, 631 So.2d 883, 889 (Ala. 1993), quoting Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 170 (Ala.1991).
Finally, the reapportionment committee guidelines merely show what the Legislature feels to be the criteria that must be met to satisfy federal and state constitutional standards in executing a redistricting plan. The guidelines stipulate that "the relative population deviation for any legislative ... district should not exceed plus or minus five percent (+ 5%)," but this rule exists expressly to ensure "that the overall deviation in the plan" meets the "permissible overall deviation" according to "federal judicial decisions." Reapportionment Committee Guidelines for Legislative, State Board of Education, and Congressional Redistricting, Il.l.b. (emphasis added). This rule does not address whether the requirements of Art. IX, § 200, have been met. Moreover, whether a legislative scheme has met federal or state constitutional requirements is not up to the Legislature if the scheme is challenged in court, because the court, not the legislature, must interpret constitutional requirements.
Furthermore, a review of the guidelines shows that its stipulations were not followed in structuring this redistricting plan. The guidelines specifically state that "proponents of Legislative and State Board of Education reapportionment plans should establish as a high priority minimizing population deviations among districts." Guidelines, Il.l.b. The plus-or-minus-five-percent range is intended as a last resort, not a goal, when designing a redistricting plan. The guidelines require that any deviations in population contained in a proposed plan must be justified in a written "detailed explanation" that shows how the deviations "further[ ] rational state policies." II.l.c. Maintaining county boundaries is not only listed as one of those "rational state policies," but is also a state constitutional requirement under Art. IX, § 200. See Guidelines, IV.7.b. In other words, according to the guidelines, the Legislature must strive to achieve maximum equality in district populations while maintaining county boundaries. If there are deviations, a detailed written explanation should be submitted of how those deviations further state policies, yet no explanation was given to the trial court here, even though the deviations under the redistricting plan clearly disregarded the goal of maintaining county boundaries.
None of the evidence submitted by the defendants addresses the state constitutional question at issue and some of the evidence even shows a clear violation of the legislature's own reapportionment guidelines. Nevertheless, the trial court cited all of these submissions as undisputed facts in support for granting the defendants' motions for a summary judgment. This misapplication, alone, of the evidence to the issue of state constitutionality merits reversing the summary judgment in this case.
But even if the defendants had met their initial burden, the arguments and evidence presented by the Rice plaintiffs constitute substantial evidence creating a genuine issue of material fact. Once the moving party makes an initial showing in favor of a summary judgment, the burden shifts to the nonmoving party to present substantial evidence creating a genuine issue of material fact in order to avoid a summary judgment. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment *171 can reasonably infer the existence of a fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see also Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996).
Initially, the Rice plaintiffs pointed out, and the defendants conceded, that this is an issue of first impression in Alabama. Only three cases have been decided construing the meaning of the requirements of Art. IX, § 200; all of those cases are federal district court cases. See Sims v. Amos, 336 F.Supp. 924 (M.D.Ala.1972); Burton v. Hobbie, 543 F.Supp. 235 (M.D.Ala.1982); and Burton v. Hobbie, 561 F.Supp. 1029 (M.D.Ala.1983). These cases provide conflicting conclusions as to how much population deviation is permitted by the language "as nearly equal to each other in the number of inhabitants as may be." Art. IX, § 200. Because there are no controlling cases on what standard of deviation the Alabama Constitution permits, a plus-or-minus-five-percent deviation under the legislative reapportionment scheme simply has no legal support.
Additionally, the Rice plaintiffs' written response to the motion for a summary judgment submitted by Senators Barron and Sanders raises several genuine issues regarding the reapportionment plan. The trial court curiously considered neither Senators Barron and Sanders's motion for a summary judgment nor the Rice plaintiffs' responseruling that both were untimely. The Barron and Sanders motion was filed on January 9, 2002; the trial court did not rule on their motion to intervene in the case until the January 10 hearing. The summary-judgment motion of those defendants could not even have been officially filed with the court until January 10; therefore, holding that their motion for a summary judgment was untimely makes no sense, particularly when the trial court heard arguments on the motion from their counsel at the January 10 hearing.
The motion for a summary judgment filed by Senators Barron and Sanders was filed on January 10; the Rice plaintiffs filed their response to that motion on January 17, certainly a timely response. In fact, the trial judge told the Rice plaintiffs at the January 10 hearing that they could file their response by January 24. Despite this statement by the trial court, the court subsequently ruled on January 28 that the response was untimely, and the court did not consider in its decision the arguments made in the motion or response or the affidavits submitted therewith.
Those affidavits clearly show that the redistricting plan at issue had not been submitted to the permanent legislative committee on reapportionment, the committee charged with considering those issues and that the plan did not conform fully with the legislative committee guidelines. As explained above, those guidelines clearly provide that deviations in population require a detailed written explanation justifying the deviations as furthering rational state goals. The guidelines also state that redistricting plans should strive to maintain county boundaries.[5] Although this redistricting plan failed in all of these respects, the trial court still found no genuine issues of material fact.
However, even if we ignore the Rice plaintiffs' response to the summary-judgment motion of Senators Barron and Sanders, their remaining arguments demonstrate *172 the constitutional problem with the redistricting plan in this case, i.e., the plan contains substantial deviations in population and disregards county boundaries. This Court finds that the integrity of county boundaries is not in issue because the Rice plaintiffs did not make the argument at trial; however, I believe their arguments relative to Art. IX, § 200, were sufficient to place the issue before us, because the integrity of county boundaries is an integral part of § 200. The Rice plaintiffs state in their complaint that Act No. 2001-727 violates Art. IX, § 200, of the Alabama Constitution of 1901. Although the Rice plaintiffs stress the requirement that senatorial districts "shall be as nearly equal to each other in the number of inhabitants as may be," the complaint itselfcombined with the defendants' submission of the redistricting mapmandates that this Court consider, and the trial court should have considered, the fact that the redistricting plan splits nearly half of the State's 67 counties, when Art. IX, § 200, explicitly states that "[n]o county shall be divided between districts...."
The federal district court for the Middle District of Alabama ordered a relaxation of the "no-division" provision of Art. IX, § 200, regarding county boundaries, in Sims v. Amos, 336 F.Supp. 924, 939 (M.D.Ala.1972), because the "one-person, one-vote" rule instituted by the United States Supreme Court has priority over the State requirement of maintaining political boundaries. However, in relaxing the standard, the court made it clear that "the requirements of equal protection necessitate, in some instances, that county lines give way in drawing legislative districts." 336 F.Supp. at 939 n. 20 (emphasis added). Indeed, "[b]oundary lines are sacrificed only where absolutely necessary to satisfy the constitutional requirement of one man one vote." 336 F.Supp. at 939 (emphasis added). Consequently, the "no-division" provision of Art. IX, § 200, cannot be arbitrarily disregarded by the legislature.
The district court in Sims explained that "the justification most often advanced by the states for permitting deviation from the ideal of one man one vote is the necessity for maintaining the integrity of political subdivisions such as counties." 336 F.Supp. at 933. Indeed, the United States Supreme Court observed in Reynolds:
"It may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting while still affording adequate representation to all parts of the State.... Somewhat more flexibility may therefore be constitutionally permissible with respect to state legislative apportionment than in congressional districting....
"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme."
377 U.S. at 578, 84 S.Ct. 1362.
Thus, the United States Supreme Court's rationale for allowing a five-percent deviation in population for state legislative apportionment is to enable states to maintain political subdivisions, such as counties, yet the redistricting plan at issue here deviates substantially from the "nearly as equal ... as may be" population requirement of Art. IX, § 200, for each senate district, while it carves up nearly half of the counties in the State. For the defendants to justify the plan's substantial deviations in population by pointing to the percentage deviations permitted by federal courts and then to ignore the very reason those courts permit those deviations defies logic.
The few federal district court cases referenced earlier that have examined the *173 constitutionality of legislative apportionment schemes under Art. IX, § 200, bear out the importance of the interplay between the percentage deviation in population provided under the scheme and the number of counties split by the scheme. Sims v. Amos, 336 F.Supp. 924 (M.D.Ala. 1972), Burton v. Hobbie, 543 F.Supp. 235 (M.D.Ala.1982), and Burton v. Hobbie, 561 F.Supp. 1029 (M.D.Ala.1983), all examine both the percentage of deviations in population between districts and the number of split counties created by the redistricting when evaluating the constitutionality of a State legislative apportionment scheme under the Alabama Constitution. There is no reason why we should not do the same, given the mandate of Art. IX, § 200.
When all of the facts and arguments are considered, it would appear that Act No. 2001-727 probably violates Art. IX, § 200, but that conclusion is not even necessary for a reversal here. All that is required is that the Rice plaintiffs have created a genuine issue of material fact. Given the lack of evidence presented by the defendants to carry their initial burden, the lack of precedent on this issue, the substantial deviations in population permitted by the plan, the number of counties split by the plan in direct contravention to both Art. IX, § 200, and the reapportionment committee guidelines, the trial court's failure to consider arguments and affidavits I believe it should have considered, and the logical contradiction in the defendants' argument, a genuine issue of material fact clearly exists in this case.
The majority of this Court discusses the propriety of judicial review and the Court's need to practice restraint in exercising that power. However, our power and scope of judicial review is not in issue here, where, as the majority recognizes, we would abdicate our responsibility if we allow the Legislature to conduct "itself in a manner inconsistent with [our] constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution." 835 So.2d at 162.
The Court is necessarily exercising judicial review in this case, because it reviews the constitutionality of Act No. 2001-727; the outcome of that review does not determine whether we are exercising that power. If the Court believes that it does not have the power to review this issue because it presents a purely legislative matter, then it should so state and refrain. But a determination that the Rice plaintiffs have not overcome the presumption of constitutionality is, in essence, an exercise of judicial review. An argument that judicial review precludes a review of a summary judgment on such an important constitutional issue is, in actuality, an avoidance of our constitutional responsibility.
Representation is the bedrock tool of our democratic republican government. "[R]epresentative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies." Reynolds v. Sims, 377 U.S. 533, 565, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It means just as much, if not more, where state legislative bodies are concerned as it does for Congress, because "[s]tate legislatures are, historically, the fountainhead of representative government in this country." Reynolds, 377 U.S. at 564, 84 S.Ct. 1362. Pretermitting argument on the legislative reapportionment scheme when possible constitutional violations are at stake is unconscionable. Further consideration of the issues is warranted; thus, summary judgment should not have been granted. Accordingly, I dissent.
*174 SEE, Justice (dissenting).
I do not disagree with the well-reasoned main opinion; I dissent only because, given the importance of this case, I would grant oral argument solely on the question of the effect of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), on the obligation the Alabama Constitution, Art. IX, § 200, places on the Legislature to create districts "as nearly equal to each other in the number of inhabitants as may be." The question whether the Legislature fulfilled its obligation to preserve county linesindeed, whether in light of Reynolds v. Sims it any longer has such an obligationis expressly not before us on appeal; yet, it is not clear to me how this Court can construe the "as nearly equal" obligation except in light of the county-preservation obligation. It may be that the Legislature should have tried harder not to divide counties and that a 10% deviation in the population of the districts would have been permissible had few counties been divided; however, 30 of the 67 counties in the State were, in fact, divided. What effect should this fact have on our evaluation of the Legislature's performance of its constitutional obligation to create districts "as nearly equal ... as may be"?
I agree with the main opinion that this Court is not without the power to review whether the Legislature has carried out its constitutional duty to redistrict. See Rice v. English, 835 So.2d 157 (Ala.2002). However, for prudential reasons, that power should rarely be exercised.[6] Legislators take the same oath of office that we do:
"I solemnly swear that I will support the Constitution of the United States, and Constitution of the State of Alabama, so long as I continue a citizen thereof; and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter, to the best of my ability. So help me God."
Thus, it well may be that whatever the answer to my question, I ultimately would defer to the judgment of the Legislature, but I cannot know that without first resolving the Reynolds v. Sims question.
NOTES
[1] Although the Rice plaintiffs stated in their complaint that the redistricting plan failed to satisfy Art. I, § 33, Ala. Const.1901, they do not make any argument in this appeal concerning § 33.
[2] Judicial review of the constitutionality of the redistricting plan cannot be said to have been beyond the contemplation of the Legislature. The redistricting plan established the Montgomery Circuit Court as the proper venue for challenges to the redistricting plan. See § 4 of Act No. 2001-727.
[3] Reapportionment Committee Guidelines for Legislative, State Board of Education, and Congressional Redistricting.
[4] The effect of Brooks v. Hobbie, 631 So.2d 883 (Ala.1993), is to confuse our responsibility under federal law, where our jurisdiction is expanded by the Supremacy Clause in the United States Constitution, with our responsibility under State law, where our jurisdiction is restricted by the separation-of-powers provision in the Alabama Constitution.
[5] I recognize that the practicality of meeting federal requirements, keeping district population "as nearly equal ... as may be," and the political process of the Legislature may impinge on the integrity of county boundaries. But the Legislature must strive for as little deviation as possible when dealing with a constitutional requirement.
[6] See Jensen v. Wisconsin Elections Board, 249 Wis.2d 706, 713, 639 N.W.2d 537, 540 (2002) ("Despite the reality that redistricting is now almost always resolved through litigation rather than legislation, we are moved to emphasize the obvious: redistricting remains an inherently political and legislative-not judicial-task.") and In re reapportionment of towns of Hartland, Windsor, and West Windsor, 160 Vt. 9, 14-15, 624 A.2d 323, 326 (1993) ("Redistricting is primarily a matter for legislative consideration and determination.' In re Senate Bill 177, 130 Vt. 365, 371, 294 a.2d 657, 660 (1997). Accordingly, the redistricting plans approved by the General Assembly are presumed to be valid, In re Senate Bill 177, 130 Vt. 358, 361, 294 A.2d 653, 654 (1972), and there is a heavy burden of proof on those who allege that a redistricting plan violates the Constitution.' Davis v. Bandemer, 478 U.S. 109, 185, 106 S.Ct. 2797, 2838, 92 L.Ed.2d 85 (1998) (Powell. J., concurring in part and dissenting in part.) Further, it is primarily the Legislature, not this Court, that must make the necessary compromises to effectuate state constitutional goals and statutory policies within the limitations imposed by federal law.")